## HELEN M. DECK *v.* THEODORE J. DECK, JR.

[No. 543, September Term, 1970.]

*Decided June 23, 1971.*

314

The cause was argued before ORTH, MOYLAN and POW-ERS, JJ.

*Samuel S. Eisenberg* for appellant.

Submitted on brief by *John E. Bohlen, Jr.,* for appellee.

POWERS, J., delivered the opinion of the Court.

Theodore J. Deck, Jr. and Helen M. Deck, married in Baltimore in 1934, were divorced in 1970 by a decree of the Circuit Court for Baltimore County, on the husband's supplemental bill of complaint alleging that his wife constructively deserted and abandoned him on July 22, 1968.

We reverse that decree and remand the case with directions that the wife be granted the relief prayed in her cross-bill of complaint.

The case was instituted by the husband's original complaint for an *a mensa* divorce filed on July 24, 1968, two days after the alleged constructive desertion by the wife. She responded with an answer, and filed a cross-complaint for an *a mensa* divorce, praying pendente lite and permanent alimony. An order of court granted "support and maintenance", pendente lite. The docket thereafter remained dormant until the husband's supplemental complaint was filed January 29, 1970 praying an absolute divorce on the same ground. The wife answered, and trial on the merits was held in open court on August 5, 1970. The chancellor stated his conclusions orally. The decree was signed August 24, 1970 and the wife appealed.

In support of his complaint Mr. Deck offered his own testimony and that of the two adult children of the parties, a son and a daughter. Mrs. Deck testified, and called a sister and a sister-in-law as witnesses.

The husband said he left the marital domicile on July 22, 1968; that he was "badgered out of the house" because he was accused of running around with the madam of a whore house and two or three other women. He said

his wife threw things at him, threw water on him, and hit him. He said he "couldn't stand it any more, I had to leave"; that it built up over a period of three months. He said that a doctor told him that his life was in danger, and that he should get out of the house and get a lawyer.

He was asked if "this all started when your wife found prophylactics around the house, and accused you of running around", and he responded that he "bought them for her". He testified that he "was getting trigger happy", "was too fast for her", and "was trying to use them to slow me down".

The adult daughter, who had not lived at home for several years, testified that her mother called her and said, "Your father has left me for another woman", and went into more detail, asserting that the husband had been running around with a whore, and other women. The daughter went to an aunt's house and found that her father was staying there. She went to the former home with her father to help him get some clothes and other belongings, and later discovered that some of the clothes were cut. She was asked by the judge if in her opinion her father's "staying there would have an adverse effect upon his health and his physical well-being", and replied, "Oh, very much so." She said he was losing weight, had gone back to smoking (after surgical removal of one fifth of one lung) and was nervous and upset. The daughter was asked if she didn't tell her mother "that he was wrong in leaving", and answered, "No, because I didn't know why he had left".

Theodore Joseph Deck III, the adult son, who also lived elsewhere, was asked if he had occasion "to hear your mother accuse your father of infidelity", and said, "When I saw—she told me that he was running around, when this all broke out, and he had told me she accused him of infidelity". He said that he agreed with the divorce, and that "to me they're just incompatible; I don't see how he stayed or she stayed with him." He was asked, "Do you feel that they're incompatible, and that they

both are partly at fault?" and responded, "Well, I don't know. If he's guilty of running around, then he's at fault; if he's not guilty, then she's at fault."

The wife denied that she threw things at her husband or struck him, or cut his clothes. She described finding rubber prophylactics around the house, hidden in several places, and said that she saw him take one off in the bathroom one time. She said that he never used them with her. She talked with him about them, and described the conversation:

> "A He said, "It's all water under the bridge."
> And I said, "It's all water under the bridge for you but not for me." And he said, "You could call it passion." I said, "I don't call it passion, I call it adultery." He said, "If you're such a good Christian you'll forgive." And I said, "Okay, I'll forgive you the first three times."

Mrs. Deck admitted accusing her husband of adultery or infidelity with a woman named Shirley, and singing to him, "If you know Shirley like I know Shirley, oh, oh, oh, what a gal". She said that she accused her husband "a few times" of running around with a whore, but never accused him in the presence of the children or of any of their friends.

The wife described her husband's leaving on July 22, 1968, and said he wanted to see the "strongbox", and he "took all our savings, and everything, and left." She said that she did not give him any reason to leave, and that he left of his own will. She was asked if she "badgered" him, and she said:

> "A Well, we had words. We had to try to come to an understanding or solution, or work it out somehow, but I couldn't do it with him, he would walk away, or something like that; of course, it made me angry."

A sister of the wife testified that she went to the Decks' every few weeks, had dinner with them a couple of weeks

before the separation, and thought they appeared normal and got along fine. She knew nothing of any arguments or fights, and did not hear of the "running around" until after the separation. The wife's sister-in-law (her brother's wife) said that they visited (with the Decks) about once a month, that they got along all right, that Mrs. Deck "was a wonderful wife to him", and that she heard nothing of any alleged "running around with a whore" until after he left.

After argument of counsel, not recorded in the transcript, the chancellor orally announced his conclusions and findings, and thereafter signed the decree granting an absolute divorce to the husband, dismissing the wife's bill of complaint, ordering that no alimony or support be paid to the wife, and ordering the husband to pay a fee of $300.00 to the wife's counsel, and to pay the costs.

In her brief and argument on appeal, the wife contends, (a) that the chancellor erred in rejecting all evidence of infidelity, and, (b) there was not legally sufficient corroboration of the alleged constructive desertion.

When one seeks an absolute divorce in Maryland on the ground of abandonment, the elements necessary to justify the relief sought,[1] as set forth in Maryland Code, Art. 16, § 24, are:

> a. That the party complained against has abandoned the party complaining. (The abandonment may be construed to be chargeable against the party whose fault caused it, even though the other party physically left the common abode.)

---

1. From an ancient date, beyond which the memory of man runneth not to the contrary, these four elements have been alleged in bills of complaint in Maryland for divorce on the ground of abandonment. *Carey, Forms and Precedents* (1885), Form No. 668, page 495. We note that the husband's supplemental complaint in this case makes no allegation that the abandonment has continued uninterruptedly. There is no testimony on the point in the record. Nor is there any testimony by any witness that the abandonment was deliberate and final, or that there was no reasonable expectation of reconciliation. No issue was raised below or here that the allegations or the proof were lacking in these respects, and we need not consider such lack to decide this case.

b. That such abandonment has continued uninterruptedly for at least eighteen months.

c. That such abandonment is deliberate and final. (This requires a finding, on the evidence, that it was the intent of the party at fault that the marriage relation should no longer exist.)

d. That the separation of the parties is beyond any reasonable expectation of reconciliation.

Maryland Code, Art. 35, § 4, says, in part, that in suits for divorce no decree shall:

"* * * be entered upon the testimony of the plaintiff alone; but in all such cases testimony in corroboration of that of the plaintiff shall be necessary * * *".

Under the statute just quoted, and under Art. 16, § 32, which was repealed in 1962, the Court of Appeals many times has had occasion to consider the sufficiency of corroboration in divorce cases. For a time, under Maryland Rule S75,[2] the courts required "testimony of a person not a party in corroboration". This requirement related to the source, not the degree or weight of corroboration.

In *Zulauf v. Zulauf*, 218 Md. 99, 145 A. 2d 414, tried and decided before the adoption of Maryland Rule 1190 f., the Court of Appeals said, at page 107, after referring to Art. 35, § 4:

"Nevertheless, when a case is contested, and there is no possibility of collusion, only slight corroboration is required. * * * Corroboration * * * may be found in evidence of admissions by the other spouse, but such admissions, unsupported by other corroborative proof, should be received with utmost caution."

See also *Sewell v. Sewell*, 218 Md. 63, 69, 145 A. 2d 422.

---

2. Originally adopted as Maryland Rule 1190 f., effective January 1, 1959. With identical language, it was redesignated as Rule S75 on January 1, 1963, and was deleted altogether, effective October 1, 1968.

That the corroboration required by Art. 35, § 4 may now again come from the other spouse was recognized in *Carpenter v. Carpenter,* 257 Md. 218, 226, 262 A. 2d 564, as a point which "may well be argued", (but which was not necessary to the decision there) and was clearly approved in *Styka v. Styka,* 257 Md. 464, 263 A. 2d 555, where Judge McWilliams, for the Court of Appeals, said, at page 469:

> "While the letter of '9-7/68' to Andrew [the husband] and the letter of 17 October 1968 to Andrew's mother [both written by Ligia, the wife] might have failed to provide the corroboration (of Ligia's intention to desert) required by former Maryland Rule S75 (deleted as of 1 October 1968) we think they amount to sufficient corroboration in the case at bar since the deletion of Rule S75 restored Code, Art. 35, § 4 to its former effectiveness."

We may therefore look to the testimony of the wife, as well as to that of the other witnesses, for the required corroboration.

It is established also that corroboration must extend to every element necessary to justify the relief sought. *Smith v. Smith,* 225 Md. 282, 285, 170 A. 2d 195, *Kerber v. Kerber,* 240 Md. 312, 214 A. 2d 164, *Smith v. Smith,* 257 Md. 263, 266, 262 A. 2d 762.

The chancellor's oral opinion, delivered at the conclusion of arguments by counsel, was prefaced by his observation that "this is about as difficult a case to decide as I can imagine." He characterized as "somewhat farfetched" the husband's explanation of the rubber prophylactics discovered by the wife, but said that there was no evidence of adultery, no evidence of a disposition to commit adultery, and no evidence of an opportunity to commit adultery. He further observed that "only a man completely bereft of his senses would bring contraceptives into his own home, which contraceptives he intended to use for adulterous purposes, he just wouldn't do it;

it's not within the realm of common sense". For details concerning another husband equally bereft of his senses, whose conduct was likewise not within the realm of common sense, see *Whitehurst v. Whitehurst*, 257 Md. 685, 264 A. 2d 822.

The husband's explanation that he "bought them for her", when she knew that they were not used at home, must have seemed even more farfetched to Mrs. Deck than it did to the chancellor. The circumstances seem to us very appropriate for remonstrances by the wife, and we think she exercised commendable restraint in keeping the subject between the parties until after the husband left the home, when explanations to other members of the family were to be expected.

Adultery was not a ground for any relief prayed by the wife—she did not even use it as a recriminatory defense to the husband's allegation of constructive abandonment. Her finding of the hidden prophylactics is involved in this case only as it bears upon the justification or lack of justification for her conduct toward her husband for the three months after she found them until he considered himself "badgered out of the house".

It is significant that the daughter did not know why her father had left until her mother told her, after the fact; and that the son felt that the fault turned on whether his father was or was not "running around". It is apparent that neither was aware of any legally sufficient compelling reason. Likewise, as the Court of Appeals said in *Beavers v. Beavers*, 255 Md. 450, at page 460, 258 A. 2d 203, "It was significant that although the husband testified that he had consulted a physician at one time, the physician was not produced as a witness."

We have carefully reviewed the entire record in this case. We cannot find the required corroboration of the allegation of the husband that the unjustifiable conduct of his wife over the period of three months before he left made continuation of the marital relation intolerable, by its effect upon his health, safety, or self respect, or that she demeaned him, by unfounded public accusations

of infidelity. Some of the cases which lead us to this conclusion are *Murphy v. Murphy,* 248 Md. 455, 237 A. 2d 523; *Ballan v. Ballan,* 251 Md. 737, 248 A. 2d 871; *Beavers v. Beavers, supra; Stewart v. Stewart,* 256 Md. 272, 260 A. 2d 71; and *Whitehurst v. Whitehurst, supra.*

There is no evidence, even uncorroborated, that it was the intent of the wife that the marriage relation should no longer exist, nor do we think that such intent could properly be inferred from the facts in evidence. There was no contradiction of her statement that "We had to try to come to an understanding or solution, or work it out somehow".

As the Court of Appeals did in *Beavers,* we have concluded that under the applicable decisions, there was not sufficient evidence to support the chancellor's finding of constructive desertion by the wife. Under Maryland Rule 1086 we conclude that the granting of the divorce to the husband and dismissal of the wife's cross-complaint were clearly erroneous.

At the beginning of the trial below, the parties stipulated that if Mrs. Deck were successful, she should be awarded the sum of $40.00 per week as permanent alimony and that Mr. Deck would pay the real estate taxes on the property owned by the parties. Upon remand, the circuit court should pass a decree denying the prayers of the husband's complaint and supplemental complaint, and granting a divorce *a mensa et thoro* to the wife, with alimony as stipulated. The portions of the decree dealing with counsel fee and costs are affirmed. The decree below should also allow counsel fees to the wife, for this appeal, and for any additional proceedings below, in the discretion of the chancellor.

> *Decree reversed in part and affirmed in part. Case remanded for passage of a decree in accordance with this opinion. Costs to be paid by appellee.*