473 A.2d 1300
**Rosalie M. BARR**

v.

**Nathaniel F. BARR.**

**No. 978, Sept. Term, 1983.**

Court of Special Appeals of Maryland.

April 13, 1984.

572

Thomas D. Murphy, Rockville, with whom were Madden & Murphy, Rockville, on the brief, for appellant.

Vincent E. Ferretti, Jr., Rockville, with whom were Ferretti, Ehrlich & Gordon, Rockville, on the brief, for appellee.

Argued before LOWE, ADKINS and BLOOM, JJ.

LOWE, Judge.

There is a suggestion in the record of this appeal and cross-appeal from the Circuit Court for Montgomery County that neither the appellant (cross-appellee), Rosalie M. Barr, nor the appellee (cross-appellant), Nathaniel F. Barr, are easily satisifed. Despite the duration of their marriage for over quarter-of-a century during which three daughters were born neither was satisfied by the union; now that it is terminated, neither is satisfied by its dissolution. Appellant wife complains that she did not get enough, arguing that:

"I.   The court committed reversible error by refusing to consider expert testimony on the present value of appellee's pension.

II.   Under the circumstances of this case, it would be an abuse of discretion not to use the 'present value' of appellee's retirement rights or to provide as, if and when payments.

III.   The court did abuse its discretion by not granting the appellant and the minor child of the parties three years use and possession of the family home, and, in the circumstances of this case, by failing to allow the minor child to complete her high school education while living in the family home.

IV.   The court erred in not reserving in the decree the power to further exercise its authority conferred by Section 3–6A–05 upon conclusion of the use and possession order of the family home."

Cross-appellant husband complains that she did not deserve what she got because:

"I.   The lower court err[ed] in granting a divorce to the plaintiff based upon the wife's grounds for divorce.

II. The lower court err[ed] in dismissing the supplemental counterclaim for divorce *a vinculo* filed by the Defendant and cross-plaintiff, Nathaniel F. Barr.

III. The lower court err[ed] in failing to make any findings concerning some personal property of the parties and in failing to make any disposition of said property.

IV. The lower court err[ed] in determining the amount of child support payable by Nathaniel F. Barr to Rosalie M. Barr."

From early in their marriage in 1956, Mrs. Barr (a certified psychiatrist)[1] was concerned that her chemist husband's libido did not fulfill her expectations. Despite her overtures his interest waned until 1975 when he refused further such participation even infrequently.

On May 3, 1980, Mrs. Barr had reason to believe that Mr. Barr was manifesting a libidinal resurrection when he explained to her the gravity of a phone call received that morning from a distraught lady. Pressed by an inquiry from Mrs. Barr, her husband hesitatingly explained that the caller was "Cora", a lady with whom he had been having an affair. Apparently Cora's husband, John, had recently found the appellee in Cora's boudoir,

"... on Saturday morning ... he was over there, and he was in her bedroom changing his clothes, and suddenly John was there, and John kicked him in the behind and cursed him out of the house.",

and was on his way to the Barr home.

"[Nathaniel] told me that the reason for the phone call to the house of May 3rd was that Cora was calling him to warn him that John was coming to our house with pictures presumably to show to me."

---

**1.** We cannot refer to either as "Doctor" Barr since both are entitled to be so addressed. Mrs. Barr was trained in the healing arts and Mr. Barr earned a doctorate in the discipline of chemistry.

Presumably this confession of relatively frequent sexual intercourse with Cora by Mr. Barr to his wife was intended to anticipate John's arrival, perhaps to prepare her for the psychological impact of John's revelation, if not to assuage her husband's conscience by a formal declaration of guilt. Alas, the portending purpose did not materialize; alack, the confidence of the confessional was not maintained. Not only did Mrs. Barr reveal the sordid sins so confessed to two of their daughters,[2] but she also demanded that he confess it to them himself. Perhaps because the acknowledgment to them of his indiscretions was no more satisfying to Mrs. Barr than their marriage had been, she sought once more to feed him crow:

"A few nights later before he finally left the house we were still eating dinner together, and at the dinner table I brought it up. I deliberately brought it up. I really thought very much within my own heart that I wanted these children to know that I was not divorcing their father for silly reasons or that there was a real reason for this that I could not continue the marriage and that I could not continue the family for them, and he had not said to them yes, I am having an affair.

So, I said to him, 'Tell these children why we are getting a divorce. Tell them,' and he did not want to say anything, and I said, 'Are you denying, or are you not saying that you had an affair or that you are having an affair?' He said that he could not deny that.

I said, 'Are you having sexual intercourse with this woman?' He said that he did not think we should discuss that in front of the children. I said that I thought the children are old enough to know what it means and what it means to us, and he said, 'Yes.' "

But for the fact that both Cora and Nathaniel declined to testify on grounds of self-incrimination, such was the adultery evidence which the trial judge found to be

---

**2.** Linda was a freshman away at college. Chris was a teenage junior in high school and Beth was a preteen not yet in high school.

"though slight, is sufficient to establish the Wife's grounds for divorce *a vinculo matrimonii.*"

The "grounds" for divorce were two only: adultery for obvious reasons and constructive desertion based on the admitted refusal of Mr. Barr to perform his husbandly role.

Mr. Barr argues that his uncorroborated admissions of adultery were insufficient to sustain a divorce on that ground and that his refusal to have intercourse with Mrs. Barr, despite her clearly understood overtures, was not constructive desertion because he did not "intend" that it terminate the marriage.

The court, of course, is not bound to believe a litigant's expression of past intent. It may infer from the conduct of an admitted refusal, together with the circumstance of subsequent departure, that his intent was to terminate the marriage despite his present protestations. Not only does the refusal belie the protestation, but also his subsequent affair hardly imputes suggestion of permanence to the nuptial bond.

Nathaniel also errs in concluding that there was insufficient corroboration of his admissions of adultery repeated to his wife and again to his daughters. Referring somewhat vaguely to a requirement for corroboration of the admissions of the husband as testified to by his wife and his children, cross-appellant relies upon only two cases in Maryland. He cites *Le Brun v. Le Brun,* 55 Md. 496 (1881), for the principle that a rule requiring corroboration was a guard against marriages being set aside by collusion.

"The great basis of human society throughout the civilized world, is founded on marriages and legitimate offspring; and where an existing marriage is proved, it is not to be exposed to the danger of being set aside by any species of collusion, or by the mere declarations of either of the parties, and should only be brought in question upon the most undisputed proofs." *Id.* at 503.

His only other Maryland authority is *Campbell v. Campbell,* 174 Md. 229, 198 A. 414 (1938), wherein adultery was

raised as a defense to the husband's suit for divorce on the then new grounds of voluntary separation. Presumably, the cross-appellant finds it significant that the Court of Appeals avoided the issue of that recriminating defense by holding the husband's admissions to several witnesses as an inadequate basis for determining that course. *Id.* at 239, 198 A. 414.

While we are not particularly impressed with cross-appellant's reliance on out-of-State authority, we acknowledge that in Maryland there has been a tradition of treating marriage as a partnership easily formed but difficult to dissolve because of the peculiar public interest involved.

" 'It has always been held, in England as well as in this country, that the public has a peculiar interest in the marriages of its citizens since upon the proper preservation of the marriage ties depends the decency and purity of society. Therefore, though unmarried persons may contract the status of marriage when they mutually please, those who have assumed it cannot cast it off by mutual consent, as parties to an ordinary contract may annul its obligations.' ...

And it is for this reason that a cause for divorce cannot be established by admission of [the] parties alone, as public policy requires that such confession to be sufficient to support a decree must be corroborated by other evidence." *Fisher v. Fisher,* 95 Md. 314, 318, 52 A. 898 (1902).

As *Fisher* points out, this "general principle" has been recognized and enforced in this State by legislative enactment. *Id.* at 318–319, 52 A. 898. The statutes and rules requiring corroboration have varied from time to time as have the statutory grounds for divorce. It appears that as the grounds for divorce have become more relaxed, so too has the need for corroboration diminished proportionately. But except for these statutes or rules, no other rule of law forbids entry of a decree for divorce upon evidence of admissions of adultery. *Schriver v. Schriver,* 185 Md. 227, 241–242, 44 A.2d 479 (1945).

The only statute relating to the corroboration of divorce testimony to which we are privy today is Md.Cts. & Jud. Proc.Code Ann., § 10–901(b) providing that with the exception of a divorce founded upon a voluntary separation agreement,

"... a decree of divorce may not be entered upon the uncorroborated testimony of the plaintiff alone."

Such, of course, was not the case here. The daughters testified to the admissions of their father, supplementing that of Mrs. Barr.

Thirty years ago, when man was still acting under the ecclesiastical admonition that he should not put asunder what God had joined together, the Court of Appeals still recognized that:

"Such admissions 'unsupported by corroborative proof should be received with the utmost circumspection and caution' ...." *Schriver, supra* at 241, 44 A.2d 479.

" 'Nevertheless,' " it held that

" 'if, after looking at the evidence with all the distrust and vigilance with which * * * it ought to be regarded, the Court should come to the conclusion, first, that the evidence is trustworthy, secondly, that it amounts to a clear, distinct and unequivocal admission of adultery, we have no hesitation in saying that the Court ought to act upon such evidence, and afford the injured party the relief sought for.'... In Maryland, divorces have been granted on evidence consisting largely of admissions of adultery. *Kremelberg v. Kremelberg*, 52 Md. 553, 556 [1879]; *Fassett v. Fassett*, 143 Md. 35, 41, 42 [121 A. 859], [1923]...." *Schriver, supra* at 241–242, 44 A.2d 479.

Certainly, the circumstances of this hotly contested case allay any concern that the parties colluded. Cross-appellant's own conduct is adequate proof of that. Not only do the circumstances and permissible inferences serve to negate any inference of collusion, they also tend affirmatively to corroborate the out-of-court admissions of adultery. Beyond that, the fact that the cross-appellant had filed an

alternative no-fault action for divorce suggests that he was opposed to the adultery divorce sought by his wife as well as her charges of constructive desertion, rather than having colluded with her to concede a fault finding ground. His ardent appeal to reverse that decision punctuates the proposition that there is not even a suspicion of collusion suggested by this case.

In light of our obvious holding that the evidence of adultery was sufficient to support the a vinculo divorce, we need but address briefly cross-appellant's evidentiary insufficiency contention regarding the constructive desertion ground. The chancellor observed:

"With respect to the Wife's allegations that the Husband refused to engage in sexual relations, the Wife testified that the parties ceased relations in 1975, notwithstanding numerous efforts on her part. Her efforts, she testified, included the loss of 37 pounds, submission to a hysterectomy operation in 1978, and numerous attempts on her part to obtain the professional assistance of a psychiatrist. Although he did not deny the Wife's testimony concerning the absence of sexual relations, the Husband attributed such inactivity and his failure to respond to her efforts to constant nagging on her part, repeated instances of berating, and numerous reflections upon his manhood. The Husband denied that any such refusal on his part was with the intention of terminating the marriage. Both parties now agree that there is no reasonable expectation of a reconciliation of the marriage."

Ample evidence was revealed in the record to support the finding that cross-appellant's admissions, albeit reluctant, corroborated his wife's allegations that he had not had intercourse with her, despite her attempts to woo him, from December 1977 through the beginning date of the trial on December 17, 1981, four years later.[3]

"Q  Subsequent to your wife's hysterectomy, do you recall any sexual intercourse, not intimacies?

A  No, I don't, Mr. Ferretti.

Q  Did you ever refuse to have sexual intercourse with your wife?

A  Not in a direct sense of eyeball to eyeball—Rosalie saying, 'Let's have sexual intercourse.'

I think I would have to agree with her statements that approaches to me that might have been interpreted reasonably as requests for sexual intercourse, I did refuse. I did not accept.

.          .          .          .          .

Q  Is it fair to say that what you describe is that your wife always accepted your advances?

A  If not one hundred percent of the time, yes.

Q  And is it fair to say that from December 28, 1977 you have never made sufficient advances to her to have sexual intercourse, is that correct?

A  Yes."

This scenario is surprisingly similar to the situation in *Zink v. Zink*, 215 Md. 197, 202, 137 A.2d 139 (1957), where a wife had also sued for divorce on the dual ground of adultery and constructive desertion because Mr. Zink

"had continuously refused to have sexual relations despite her efforts to woo him." *Id.* at 200, 137 A.2d 139.

Mr. Zink had agreed at the beginning of the trial not to contest the desertion "if the question of adultery was not gone into." *Id.* at 201, 137 A.2d 139. This being so, the case was treated by the Court of Appeals as one where there was a possibility of collusion and the degree of corroboration required rose proportionately. *Id.* at 201, 137 A.2d 139.

---

**3.**  The parties disagree about the date of their last sexual intercourse. Mrs. Barr stated it was January 1975 and denied that any sexual relations occurred in 1977.

The only corroboration of the cessation of sexual relations by Mr. Zink despite Mrs. Zink's efforts was from a niece who testified that her aunt had told her in the presence of Mr. Zink who stood mute, that the couple had not been " 'man and wife since 1950' ". Because

"[h]usbands and wives do not naturally and customarily discuss intimate problems or difficulties with outsiders, and it is more unlikely than likely that a husband would debate with his wife in the presence of a third person the details of their intimate life." *Id.* at 203, 137 A.2d 139.

the Court of Appeals held that the corroboration of the wife's allegation was insufficient. Judge Hammond's comments for the Court on the state of the law of corroboration in contested divorce cases is most instructive.

"It has been held that in a contested case, where the possibility of collusion is slight, evidence of corroboration may be found in the admission of the other spouse. *Brennecke v. Brennecke,* [213 Md. 447, 132 A.2d 106 (1957) ] *supra; Cullotta v. Cullotta,* 193 Md. 374, 382 [66 A.2d 919] [1949]; *Maranto v. Maranto,* 192 Md. 214, 217 [64 A.2d 144] [1949]. Where a party to an action adopts a statement uttered by another, it becomes his own admission. In some situations standing mute may constitute the adoption of the statement of another person. This can be only when no other explanation is equally consistent with silence—*i.e.,* if the situation and circumstances are such that a dissent in ordinary experience would have been expressed if the statement or communication had not been correct. 4 *Wigmore, Evidence* (3d ed.), Secs. 1069 and 1071). *McCormick, Evidence,* Sec. 247, at 528, 530, discusses the rule and says: 'If a statement is made by another person in the presence of a party to the action, containing assertions of facts which, if untrue, the party would under all the circumstances naturally be expected to deny, his failure to speak is circumstantial evidence that he believes the statements to be true and his conduct is thus receivable against him as an admission of such belief.' He points out that a failure to deny may be more

naturally explainable on some inference other than that of belief in the truth of the inference and that the evidence is then to be excluded. If an admission by silence is to be received against the silent party, it must be found (1) that the statement was actually made; (2) that the reaction of silence or evasion took place as claimed; (3) that the party heard and understood the statement; and (4) that under all the circumstances the party's conduct makes it probable that he believed the statement to be true." *Id.* at 202, 137 A.2d 139.

■ Since divorces are now permitted by voluntary agreement (which itself suggests collusion) with but a year's wait, the suspicion of collusion is not nearly as likely as when divorces were available only for some specified aberrant conduct. The need for corroboration does not seem as necessary to protect the public interest from collusion as it is to protect an absent party in an ex parte proceeding. It has long been held, even before the relaxation of the divorce grounds and procedures, that when a case is contested and there is no possibility of collusion, only slight corroboration is required, *Zulauf v. Zulauf*, 218 Md. 99, 107, 145 A.2d 414 (1958); *Deck v. Deck*, 12 Md.App. 313, 318, 278 A.2d 434 (1971). The circumstances of the admission by a distraught husband apparently about to be exposed by his paramour's husband who subsequently, though reluctantly, repeats his confessions to his daughters, subjecting himself to eviction from the family circle, does not smack of collusion and is sufficient to prove the adultery confessed. The statutory requirement for a corroboration of someone other than a party is satisfied. If more is necessary, the circumstance of the silence of the transgressors—when there was opportunity to deny—is itself corroboration through the inference that their withheld testimony would have been unfavorable. Ironically the same declination implies that by having withheld his admissions such reluctance to admit negates any inference of collusion. Piling Ossa on Olympus if the adultery evidence was insufficient, certainly cross-appellant's reluctant admissions of

having knowingly rebuked his wife's advances for four years was an admission, sufficient of itself to corroborate Mrs. Barr's desertion testimony in this hotly contested case. *Zink, supra* 215 Md. at 202, 137 A.2d 139. It follows that the divorce was properly granted and, as well, that the trial court did not err in dismissing the supplemental counterclaim for divorce on no-fault grounds.

We turn to the material aspects of the dissolution with which we have but one minor concern. Before addressing it, we will dispose of the less distressing consideration raised by both appellant and cross-appellant.

The marital property under consideration of the court consisted of the home and its contents together with certain retirement entitlements of both parties. Mrs. Barr is employed part-time by the Montgomery County Department of Health and practices psychiatry from the home which was their marital residence. She had contributed $12,000 to a retirement plan. Her husband is a chemist with the United States Department of Energy. He had contributed $40,000 to his retirement plan. His present earnings approximated $57,500 per year while hers were $35,700, or in net monthly income terms, $2,684 and $2,030 respectively.

The judge found that only one daughter remained unemancipated, Beth who was at the time of the trial 14 years old and a sophomore in high school. He found that her monthly expenses, within the standard of living to which she was entitled by custom, were $1052. Her custody was retained by her mother who was permitted the use and possession of the family home for a period of two years starting on August 1, 1982. The court ordered Beth's father to pay $600 per month to Mrs. Barr for his contribution to Beth's support; however, Mrs. Barr was required to assume responsibility for all of the expenses of the family home during her possession.

Several concerns relate to this portion of the ruling. Appellant complains that as custodian of Beth she should have been given possession for all but a month, rather than

a year, of the three year maximum period of use and occupancy of the family home permitted by Cts. Art., § 3–6A–06(e). She pointed out that by having limited the use and occupancy to two years, Beth will have just completed her junior year of high school and will be uprooted not only from her home environment but also will likely be compelled to complete her high school senior year in a different school environment than that at which she has theretofore become accustomed. Circumstantially, it is significant that Beth's 18th birthday on June 28, 1985 will be almost one year after she may have been uprooted from home and school by the court ordered termination of use and occupancy on August 1, 1984.

■ This is the issue that gives us pause. The *sole* purpose, not merely the primary purpose, of the use and occupancy provision is to permit the child or children of the family to live in the community and environment which is familiar to them. *Bledsoe v. Bledsoe*, 294 Md. 183, 191, 448 A.2d 353 (1982). A parent's or spouse's needs are of no consideration except as those needs contribute to, or reflect upon, the obligation she or he owes to the child or children. *Ibid.*

■ The record does not reflect whether the judge considered the psychological impact upon a teenage child born and raised in an one home environment, attending a community school being uprooted one year before both high school graduation and the attainment of the age of legislated maturity. Nor can we be certain in a practical sense that the trial judge considered the interpretive significance of the Legislature's focus on the importance of environmental stability to a child already disturbed by the trauma of her parents' divorce since *Bledsoe*'s analysis was not published until 1983 (although filed August 9, 1982 five months before this divorce decree was issued). Because we are concerned over that child's best interest, and are certain the trial judge is also, we will remand this case for his reconsideration of the period of use and occupancy, viewing the circum-

stances we have discussed in light of the purpose of that unique statutory authority as interpreted by the Court of Appeals in *Bledsoe.* Seemingly then, a present adjustment of Beth in her sophomore year may have been even less traumatic without the anticipation of the portending necessary departure one year before her graduation. When either could be so easily avoided, we wonder that the court neither availed itself of the full three years for the use and possession order allowed it, nor explained its decision not to do so.

While we are not concerned that the court failed to reserve expressly its power to exercise the authority implicitly conferred upon it by § 3–6A–05(a)(2):

> "Family use personal property or the family home shall not be considered marital property so long as it is the subject of a use and possession order.",

appellant is disturbed and cross-appellant is partially so. Appellant fears that the failure of the court expressly to reserve by declaration "its power to further consider the family home as marital property", may divest the court of "jurisdiction to later make a further adjudication of a marital award to the Appellant." She is presumably concerned because she allegedly spent $8,000 for an office in the house for psychiatric consultations.

Appellee, on the other hand, argues that there was no need so to reserve because § 3–6A–06(f) expressly authorizes the court to make the determination at the termination of the use and occupancy order. That subsection states that:

> "Upon the termination of an order issued under this section of the family home or family use personal property, the property shall be treated as marital property if it so qualifies, and the court shall consider the factors set forth in § 3–6A–05(b) in arriving at a division of the proceeds or value of the property. If however, the family home or the item of family use personal property was acquired by one of the parties before marriage or by

inheritance, or was acquired by gift by one of the parties from a third party or was excluded by valid agreement, then upon termination of the order the property shall be awarded to the party who owns it."

Ironically, however, on cross-appeal he argues that the court should have declared the status of certain personalty within the residence even if it were to be made subject to the use and occupancy order. While personally owned personalty could still be subject to the order, he argues that he

"would be in a position to know that at the time of the expiration of the use and possession Order the Court could make such determination concerning the personal property as would be proper considering whether such property that is the subject of a use and possession order were marital property or non-marital property and if marital property, the value of said marital property."

■ It seems clear that no express reservation of "power" is necessary to retain the authority reserved to the court by statute to conduct its marital disposition determinations of the family home and personalty when the use and occupancy order ends. To the contrary, § 3–6A–05(a)(2) seems to make clear that such determination of personal property or family home is *not* to be considered as long as such property is subject to the order. Appellant may rest assured that her concerns may be considered when her use and occupancy order terminates; but appellee must wait in anxious anticipation for the determination of the personal property in the residence, all of which is implicitly included in the use and occupancy order.

■ We also hold that the trial judge did not abuse his discretion in finding the needs of the minor child to be $1052 per month. The fact that previous needs of the entire family of five may have been $20,000 per year does not mandate a divisible proportion of that sum as the maximum needs of each member. Nor do we find fault with the court having apportioned Beth's support needs

between the parties in accordance with their respective net incomes. The court used the exact figure reflecting that income which each party had provided. Finally, we think it is will ill-grace that cross-appellant complains that he is charged too much for Beth's keep but, by demanding a credit for prior contributions, admits to having voluntarily paid more in the past than is demanded in the future. That cross-appellant has no right to recoup what he has volunteered heretofore should need no legal authority, but since it is challenged, we point to our statement in *Rand v. Rand*, 40 Md.App. 550, 553, 392 A.2d 1149 (1978):

> "that a party making child support payments pursuant to a court order has no *right* to restitution or recoupment following a reversal or modification of the award on appeal."

Surely, if there is no right to recoupment for improperly ordered awards, that which is volunteered is a consummated gift.

We conclude with appellant Rosalie's primary concern, the marital award reflecting appellant's interest in appellee's retirement benefits. Appellant's "expert" testified as to his opinion of the present value of appellee's federal pension, which he determined to be $154,419, explaining his computations therefor. Appellee's expert was less optimistic. He testified that according to his analysis he could generate the appellee's pension value as low as $12,000 and as high as $89,000. He pointed out the many variables that must be considered in appraising a pension system and suggested that it would be pure speculation to attempt such a concrete calculation. He even said that he would advise the appellee that, if he left government service that day, he should take his $40,000 contribution and invest it rather than awaiting his annuity at age 62.

The appellant complains that the court refused "to consider" expert testimony on the present value of

appellee's pension.[4]   To the contrary, however, as appellant points out by quoting from the court's opinion

"The Court heard extensively from expert witnesses concerning valuation of said entitlements; however, the Court deems such testimony to be speculative in nature and inappropriate for consideration as a basis for division between the parties."

Appellant's complaint is not that the court failed "to consider" the testimony;  it is rather that it failed to be persuaded by her expert.   Not only did the judge consider all of the testimony, he was persuaded by appellee's expert that the variables involved in computing the present value of a future pension made its prognostication too speculative.

He, therefore, subtracted the wife's accrued contributions of $12,000 from the husband's $40,000 accrued contributions and

"[i]n recognition of the Wife's financial sacrifices in support of the Husband's career, which necessarily limited her ability to accumulate a comparable retirement fund of her own, and taking into account the economic circumstances of the parties at the present time, as well as the other factors set forth in Section 3–6A–05, *supra*, the Court will adjust the equities of the parties by granting a monetary award to the Wife in the sum of $14,000.00, said sum to be payable by the husband upon the sale of the family home."

We see no error in that procedure.   In *Grant v. Zich*, 53 Md.App. 610, 456 A.2d 75 (1983), *cert. granted*, 296 Md. 110 (1983), we found no fault with the election of the trial judge to use as the measure of the value of the retirement benefits, Mr. Zich's contributions to the retirement fund during the marriage.

---

**4.**   There was no testimony by either expert about the wife's retirement benefits' present value.

Appellant seeks to distinguish *Zich* by noting that Dr. Grant had failed to provide a basis for evaluating the various methods of valuing retirement benefits. Here, of course, that same reasoning would apply, *i.e.*, that appellant failed to provide a persuasive evaluation. The judge was simply persuaded by appellee's expert who pointed out the speculative nature of the numerous variables entering into the computations.

Appellant then argues that:

"This Court should formulate the law in this State to be that the chancellors of our trial courts should not use the contribution approach when the parties are similarly situated as here."

Presumably, appellant is asking us to reverse *Zich, supra,* and hold that a chancellor may never consider an apportionment of a retirement benefit based upon the employee's contributions. Not only are we not inclined to do so, but also we have no such authority. The Court of Appeals has discussed the three methods of determining the proper allocation of retirement benefits between the parties as summarized in a Wisconsin case, *Bloomer v. Bloomer,* 84 Wis.2d 124, 267 N.W.2d 235 (1978). These were 1) to award an appropriate share of the contributions of the earning spouse to the non-earning spouse, 2) to compute and award the benefits as based upon their present value (but this was recognized as a very difficult calculation which should not be used where it becomes too speculative) or 3) to determine a fixed percentage of the benefits to be paid the non-earning spouse as, if, and when paid to the earning spouse.

The Court of Appeals stated in *Deering v. Deering,* 292 Md. 115, 131, 437 A.2d 883 (1981), that:

"In our view, any of the just articulated approaches may represent the proper one for the trial courts of this State to take. And whether any particular option represents an appropriate exercise of discretion depends, of necessity, upon the circumstances of the individual case."

Since we do not find an abuse of discretion under the circumstances of this case, we are without authority to circumscribe the options given to the trial courts by the Court of Appeals. While we appreciate the help volunteered by the Women's Legal Defense Fund which was permitted to submit an Amicus Curiae brief, we are neither persuaded by its arguments, nor may we disregard the clear mandate of the Court of Appeals, although the "if, as and when" approach seems less encumbered by potential inequities.

We hold that Mrs. Barr got enough but no more than she deserved; however, the youngest daughter of the parties may have been shortchanged. We will, therefore, affirm the judgment of the court but for the time limitation placed upon the use and occupancy order which will be vacated for reconsideration in light of this opinion.

JUDGMENT AFFIRMED IN PART AND VACATED IN PART. ORDER OF USE AND OCCUPANCY TO BE RECONSIDERED IN LIGHT OF THIS OPINION. COSTS OF THE APPEAL TO BE DIVIDED EQUALLY: COSTS OF THE CROSS–APPEAL TO BE PAID BY CROSS–APPELLANT.