582 A.2d 574

**Herman ALSTON**

**v.**

**Viola ALSTON.**

**No. 258, Sept. Term, 1990.**

Court of Special Appeals of Maryland.

Dec. 3, 1990.

Certiorari Granted March 26, 1991.

Ann M. Turnbull (Turnbull, Wase & Lyons, P.A., on the brief), Towson, for appellant.

William D. Berwick (George W. White, Jr. and White, Mindel, Clarke, & Foard, on the brief), Towson, for appellee.

Argued before WILNER, C.J., and BISHOP and ALPERT, JJ.

BISHOP, Judge.

Herman Alston (Herman) appeals from a decree of the Circuit Court for Baltimore County which granted Viola Alston (Viola) an absolute divorce on the ground of adultery. The decree also equally divided the marital property by allowing each party to retain possession of the property in their control with the exception of awarding Viola fifty

percent of the remaining eighteen yearly installments of $44,000.00 in after tax income Herman is to receive for winning the D.C. Lotto.

## ISSUES

1. Whether the court erred in granting Viola Alston an absolute divorce on the ground of adultery.

2. Whether the court erred in distributing the marital property by awarding Viola Alston fifty percent of the remaining eighteen yearly installments Herman Alston is to receive for winning the D.C. Lotto.

## FACTS

The parties were married on July 11, 1964. They had two children, Michelle, born in 1967, and Robert, born in 1970, both of whom were emancipated at the time of trial.

For the first ten years of their married life, Herman served in the U.S. Army. Herman traveled to Baltimore from his station in France to get married and then returned to Europe. Viola lived with Herman's parents in Baltimore until Herman returned, approximately one year later. Upon his transfer to the United States, Herman was assigned to aviation school in Fort Rutger, Alabama. Viola stayed with Herman for about three months until she discovered she was pregnant and returned to Baltimore to be near her family during the pregnancy. Soon after Michelle was born, Viola and Michelle returned to Fort Rutger. A few months later, Herman was assigned to Texas. Viola and Michelle initially returned to Baltimore and, a few months later, joined Herman in Texas.

In 1968, Herman went to Vietnam where he served for approximately one year. Viola and Michelle returned to Baltimore. After serving in Vietnam, Herman was stationed at Fort Eustis, Virginia for approximately one year during which Viola and Michelle remained in Baltimore. During this time, their son, Robert, was born. Herman was discharged while at Fort Eustis, and moved to Baltimore for

approximately four or five months until he re-enlisted in the Army and was assigned to Fort Benning, Georgia. All four family members traveled to Fort Benning where they lived together for the next seven to eight months.

Herman then returned to Vietnam for another one year tour of duty, and the rest of the family returned to Baltimore. Herman returned to the United States in November 1972, and was assigned to Fort Lewis, Washington. The entire family lived there for approximately eighteen months.

Herman requested and received a discharge in 1974 and moved his family to Baltimore to go into business with his brother. The business soon collapsed and Herman went to work as a prison guard for the Department of Corrections in Washington, D.C., earning approximately $29,000.00 per year. Herman continued to be employed as a prison guard until he retired in March 1988.

Viola worked outside of the home approximately twenty-two years of their twenty-five year marriage. Since 1975, she has worked as a clerk at the Social Security Administration earning approximately $19,000.00 per year.

In June 1978, the Alstons separated when Viola moved out of the family home with the children, her belongings, and some of the furniture. They remained separated until some time in 1981 when they reconciled and attempted to live together. In 1985, Viola left again, this time without the children; however, the children went to live with her one week later when they and Herman were evicted. The Alstons have lived separate and apart since 1985.

In November 1987, Herman won $1.1 million in the D.C. Lotto, to be distributed in twenty annual payments of $44,000.00 (net after taxes). By the time of trial, October 12, 1989, Herman had received two $44,000.00 payments from the D.C. Lotto. None of this money was given to Viola. In March 1988, he retired from the Department of Corrections and received a lump sum payment of $16,000.00 from his retirement plan.

In April 1989, Viola filed an Amended Complaint for Absolute Divorce in which she alleged Herman's adultery and sought permanent alimony, attorney's fees and at least half of the marital property. In May 1989, Herman filed his Answer to the Amended Complaint, and an Amended Counter–Complaint for Absolute Divorce based on grounds of abandonment, adultery and cruelty in which he asked that each party pay its own legal fees.

At trial, Viola testified that both she and Herman paid the bills. She paid the phone bill, gas bill and electric bill, Herman paid the rent, and they alternated paying for groceries. Herman did not always pay the rent. At times, Herman did not have enough money to buy his share of the groceries. Viola also testified that she bought the children's clothes. Viola testified that she raised the children, that Herman did not want a family, did not care about the children, and in fact, does not speak to them now. Viola also testified that Herman openly committed adultery throughout their marriage. He flaunted his girlfriends so that she knew that he was involved with other women. He would receive telephone calls from different women although the Alstons' telephone number was unlisted.

Viola testified that she shot at Herman while they were living together in Fort Benning, Georgia. She was trying to sleep and the phone kept ringing and a girl would ask for Herman. She became angry and shot one shot into the floor near Herman. Viola testified that after a woman named Brenda called for Herman she got angry, picked up a kitchen knife, and told him to leave. She then called the police who came and asked Herman to leave. He said that he would leave, but when the police left, he stayed.

During cross-examination, Viola admitted that she had sexual relations during their first separation with a man named Frank. She denied any affairs in her answers to interrogatories, but revealed this relationship with Frank during her deposition. Viola denied sexual relations with any other men.

Herman testified that Viola's only contribution to the marriage was her ability to make people miserable, that the children did "eighty percent of the housework," and Viola and Michelle continuously argued and bickered and on one occasion got into a "physical fight." Referring to the shooting at Fort Benning, Georgia, Herman testified that Viola shot at him and that the bullet went past his head. She was propped up on pillows in bed and shot at him without provocation as he was walking out the bedroom door. Referring to the knife incident, Herman testified that Viola tried to stab him while he was lying in bed. She put 15 puncture marks in the mattress. He wanted to call the police but she unplugged the telephone and kept it from him. When he tried to take the knife from her, Michelle protected Viola by threatening to hit him with a long steel pipe. Herman further testified that Viola tried to commit suicide by taking an overdose of pills while they were living at Fort Benning, Georgia. On another occasion, Viola told Herman that she did not want to complete her pregnancy with Robert and was going to kill herself.

Herman also accused Viola of committing adultery. Herman testified that during their time in Fort Lewis, Washington, Viola went out at night and returned home drunk, early in the morning. At times she would return home with jewelry and trinkets. Herman testified that Viola admitted that these gifts came from a man she was seeing. Telephone calls were received at home and when he answered the caller would hang up. The calls stopped after he and Viola had the phone tapped.

In his answers to interrogatories, Herman admitted to having had sexual relations with a woman named Flossy Blackwell during their first separation and with a woman named Kimmy since their last separation. On direct examination, Herman stated that he did not have sexual relations with any other women during his marriage. During cross-examination, Herman admitted having an affair with a

woman named Berma while stationed at Fort Rutger, Alabama. Herman explained these contradictory statements by saying, "Mr. White [opposing counsel], if you go back 30 years and find out who you had sex with, do you remember everybody?" Herman also testified that Ms. Blackwell has continued to visit him, and that he gave her $1000 for the use of her truck. Herman also stated that he gambled at the race track in 1985 and confirmed that he reported winnings of $600 on his income tax return.

Michelle testified that Viola took responsibility for raising the children. Herman, she testified, "seemed like he doesn't [sic] really want to be part of the family." Michelle testified that she and her mother were close, although they did argue at times. One time they did get in a "physical fight" because Viola wouldn't let her stay out as late as she wanted. Michelle testified that she did not believe her father always paid the rent because of the overdue notices. She also testified that she moved in with her mother, a short time after Viola left in 1985, because they had been evicted.

Robert testified that he is presently living with his mother and working full time. He testified that Herman did not help with the family:

Me and my sister and all of us, she was taking care of us. And I mean he was there, but he wasn't there in the sense that, you know, he would help us. Meaning me and my sister when we needed things. When we needed something we knew to go ask my mother, not to ask him because we wouldn't get it.

Robert testified that it was his mother who cared for him and Michelle.

The final witness was Roland Alston, Herman's brother. He testified that he often found Herman cooking when he went to visit. Roland also testified that Herman would go to the track "once in a while" to play a race.

## DISCUSSION

Md.Rule 8–131(c)[1] provides that where an action is tried without a jury, "[we] will not set aside the judgment of the court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses." *See Harp v. Harp,* 198 Md. 485, 488–9, 84 A.2d 895 (1951); *Colburn v. Colburn,* 15 Md.App. 503, 513, 292 A.2d 121 (1972). If there is any evidence legally sufficient to support the court's findings, they are not clearly erroneous, for the weight of the evidence is a question for the court, sitting as the finder of fact. *Weisman v. Connors,* 76 Md.App. 488, 500, 547 A.2d 636 (1988); *Kline v. Chase Manhattan Bank,* 43 Md.App. 133, 141–2, 403 A.2d 395 (1979); *Staley v. Staley,* 25 Md. App. 99, 110, 335 A.2d 114 (1975).

While the "clearly erroneous" standard applies to the court's findings of fact, the application of the law to the facts is judged on the abuse of discretion standard.

### 1.

### *Absolute Divorce on Grounds of Adultery*

 In accord with Md.Family Law Code Ann. § 7–103(a)(1) (1984) the court granted Viola an absolute divorce based on Herman's adultery. Appellant contends that the evidence was insufficient to support the court's finding. We disagree.

Adultery may be proven with circumstantial evidence that "would lead the guarded discretion of a reasonable and just man to the conclusion." *Pohzehl v. Pohzehl,* 205 Md. 395, 405, 109 A.2d 58 (1954); *accord, Goldschmiedt v. Goldschmiedt,* 258 Md. 22, 23–4, 265 A.2d 264 (1970). Although the "court may not enter a decree of divorce on the uncorroborated testimony of the party seeking the divorce," Md. Family Law Code Ann. § 7–101(b) (1984), "the corroboration in a genuinely contested divorce case may be slight." *Col-*

---

**1.** Md.Rule 8–131(c) is derived from former Rules 1086 and 886.

*burn,* 15 Md.App. at 512, 292 A.2d 121, *citing Styka v. Styka,* 257 Md. 464, 469, 263 A.2d 555 (1970). In such a case, the "evidence of corroboration may be found in the admission of the other spouse." *Barr v. Barr,* 58 Md.App. 569, 582, 473 A.2d 1300 (1984); *accord, Deck v. Deck,* 12 Md.App. 313, 319, 278 A.2d 434 (1971).

Tracing the history of divorce law in this State, this Court, in *Barr,* explained that traditionally, the preservation of the marital union was necessary to protect the decency and purity of society. 58 Md.App. at 578, 473 A.2d 1300. For this reason, husband and wife could not "cast it off by mutual consent, as parties to an ordinary contract may annul its obligations." *Id.* (citations omitted). Therefore, to prevent collusion, admissions of adultery by the parties were required to be corroborated by other evidence. *Id.* As time progressed, the grounds for divorce became more relaxed and so too the need for corroboration diminished proportionally. *Id.* "[D]ivorces are now permitted by voluntary agreement ... with but a year's wait, the suspicion of collusion is not nearly as likely as when divorces were available only for some specified aberrant conduct." *Id.* at 583, 473 A.2d 1300.

In *Barr,* the wife accused the husband of adultery and testified that he had admitted having an affair moments before he believed his paramour's husband was about to expose him. She then testified that she forced him to admit the same to his daughters. *Id.* at 576, 473 A.2d 1300. The daughters, in turn, testified to the admissions of their father. *Id.* at 579, 473 A.2d 1300. The *Barr* Court found the case to be "hotly contested" based on the husband's filing of an alternate no fault action for divorce and ardent appeal to reverse the trial court's decision. *Id.* at 579–80, 473 A.2d 1300. In addition,

[t]he circumstances of the admission by a distraught husband apparently about to be exposed by his paramour's husband who subsequently, though reluctantly, repeats his confessions to his daughters, subjecting himself to eviction from the family circle, does not smack of

collusion and is sufficient to prove the adultery confessed. The statutory requirement for a corroboration of someone other than [the plaintiff alone] [2] is satisfied. *Id.* at 583, 473 A.2d 1300.

Similarly, in the case *sub judice*, Herman filed alternate pleadings and reluctantly admitted committing adultery. Herman filed an Answer to Viola's Amended Complaint in which he denied adultery and filed an Amended Counter-Complaint alleging abandonment, adultery and cruelty. He then filed this appeal following the adverse decision of the court. At trial, Viola accused Herman of numerous affairs. Herman admitted to three affairs, the third during cross-examination after stating that he had only had two affairs. He then questioned how anyone could remember everyone they had sex with during a lengthy marriage. The pleadings and the evidence demonstrate this case to be contested and not collusive. Further, Herman's denials followed by his reluctant admissions corroborated Viola's charges and damaged his credibility. This evidence is sufficient to support the court's grant of absolute divorce to Viola on the ground of Herman's adultery.[3]

The court was not clearly erroneous in its factual conclusion and did not abuse its discretion in the application of the law to the facts.

### 2.

### *Disposition of Marital Property*

Subsection 2 of Title 8 of Md.Family Law Code Ann.

---

2. Md.Cts. & Jud.Proc.Code Ann. § 10–901(b) from which Md. Fam.Law Code Ann. § 7–101(b) (1984) is derived is the section referred to in this passage. Where the quote states "a party" we have substituted "the plaintiff alone" to cite correctly the statute.

3. Viola did admit one affair during the first separation. Herman made vague claims of adultery on other occasions which were not corroborated. This evidence, however, will not disturb our conclusion, since the judge is presumed to know the law, and must have found that adultery condoned otherwise he would not have granted the divorce.

(1984)[4] authorizes the court to "grant a monetary award as an adjustment of the equities and rights of the parties concerning marital property." Family Law § 8–205(a). "A monetary award is designed to accomplish an equitable division of marital property in an indirect manner, in accordance with the announced policy of the legislature which is to give careful consideration to both monetary and nonmonetary contributions by the spouses to the marriage." *Nisos v. Nisos,* 60 Md.App. 368, 377, 483 A.2d 97 (1984) (citations omitted).

Sections 8–203 through 8–205 require a three step process. First, "if there is a dispute as to whether certain property is marital property, the court shall determine which property is marital property." § 8–203(a).[5] Second, "[t]he court shall determine the value of all marital property." § 8–204. Third, after considering the ten factors set forth in § 8–205(a), "the court may grant a monetary award as an adjustment of the equities and rights of the parties concerning marital property...." *Id.*

The parties agreed that the D.C. Lotto winnings were marital property. As there is no dispute, the court need go no further. The court valued the marital property, specifically Herman's D.C. Lotto winnings, at $44,000.00 (net after taxes) per year for twenty years.

The court awarded Viola fifty percent of the remaining eighteen yearly D.C. Lotto installments after discussing each of the ten factors of § 8–205(a). In the past, we have

---

**4.** Md.Cts. & Jud.Proc.Code Ann. § 3–6A–05 (1984) was recodified without substantive change as Md.Family Law Code Ann. §§ 8–203 through 205 (1984). *Nisos v. Nisos,* 60 Md.App. 368, 377 n. 2, 483 A.2d 97 (1984).

**5.** Section 8–201 provides in part:
 (e) *Marital property.*—(1) "Marital property" means the property, however titled, acquired by 1 or both parties during the marriage.
 (2) "Marital property" does not include property:
 (i) acquired before the marriage;
 (ii) acquired by inheritance or gift from a third party;
 (iii) excluded by valid agreement; or
 (iv) directly traceable to any of these sources.

reversed a court's distribution only where it was "clear from the record that the [court] gave no more than lip service to the [ten] factors," *Ward v. Ward,* 52 Md.App. 336, 343–4, 449 A.2d 443 (1982), or where the court misinterpreted or dismissed as unimportant one of the factors. *Mount v. Mount,* 59 Md.App. 538, 553, 476 A.2d 1175 (1984).

Appellant contends that the court abused its discretion by not properly considering the ten factors of § 8–205, specifically that there was insufficient evidence to support the court's findings related to § 8–205(a)(1), (3), (4) and (8). We will address each in the order presented by appellant.

### Eighth Factor

Section 8–205(a)(8) requires the court to consider "how and when specific marital property was acquired, including the effort expended by each party in accumulating the marital property." The court made the following findings with respect to this factor:

> Mr. Alston argues the eighth factor, how the marital property was acquired, is of great significance. Of course, the court also considered in regard to that the effort put into it. The only difference being that Mr. Alston took the time and effort and money, whatever it cost, to purchase the lottery ticket. Beyond that, there isn't much to say in his favor with regard to that.

Appellant cries error because "the acquisition of the D.C. Lotto annuity at least two years after the parties' separation had no relation whatsoever to the efforts or plans of the parties when they lived together." While this may be accurate, this alone will not control a distribution under § 8–205. When the parties correctly conceded that the D.C. Lotto annuity was marital property, the court could not find it to be individual property and thus the method of acquisition, which would have controlled under a § 8–203(a) distribution,[6] became merely one factor among

---

6. *See supra* note 4 and accompanying text.

ten statutory factors, with its weight to be determined by the court as the trier of fact.

Appellant relies on two out-of-state lottery cases, *Giedinghagen v. Giedinghagen*, 712 S.W.2d 711 (Mo.App.1986) and *Dyer v. Dyer*, 536 A.2d 453, *appeal den.*, 519 Pa. 654, 546 A.2d 58 (1988). Neither support his contentions. Each concerns a question of whether lottery winnings is marital property. This is not at issue in the case *sub judice*. In fact, once the court in *Giedinghagen*, 712 S.W.2d at 713, determined that lottery winnings won by the wife after separation but before divorce were marital property, it declared:

> We do not hold nor intimate that husband here is entitled to any portion of the proceeds of the lottery winnings. The court is to make a *just* distribution of the marital property and in doing so may take into account the contribution of each spouse to the acquisition of the property as well as other considerations. (emphasis in original).

*Id.* at 714.

■ Further, the *Dyer* court determined that the husband's lottery winnings were his sole and separate property because Pa.Stat.Ann. tit. 23, § 401(e)(4) (Purdon 1990) excludes from the definition of marital property, property acquired after separation but before divorce, unless the property was acquired in exchange for marital assets. This is not the law in Maryland. § 8–201(e); *Wilen v. Wilen*, 61 Md.App. 337, 345–6, 486 A.2d 775 (1985), *citing Cotter v. Cotter*, 58 Md.App. 529, 537, 473 A.2d 970 (1984). The court *sub judice* found that appellant's acquisition after the separation required only a small effort. This finding was not clearly erroneous.

### First Factor

■ Section 8–205(a)(1) requires the court to consider "the contributions, monetary and non-monetary, of each

party to the well-being of the family." The court made the following findings:

> With respect to the first factor, the contribution of each to the marriage, the court finds that the monetary contributions were fairly equal. However, on the non-monetary side, the court is convinced from the evidence that the wife's contribution significantly exceeds that of the husband.

Appellant cites *Mount v. Mount*, 59 Md.App. 538, 553, 476 A.2d 1175 (1984) for the contention that Viola needed to do more than raise the children to make a non-economic contribution to the marriage. This is not the holding of *Mount;* rather, taking care of the children is one non-economic contribution among many which may include "for example, the preparation of meals, doing laundry, providing a clean and wholesome house, etc." *Id.* There was ample testimony from Viola, Robert, and Michelle to support the court's finding that Viola's non-economic contributions far exceeded Herman's contributions. The testimony of Viola, the children, and Herman demonstrated that Viola, practically alone, raised the children, and that on one occasion when Herman had sole care of Robert and Michelle, they were evicted within one week. Moreover, Viola's non-economic contributions were in addition to her economic contributions which equalled those of Herman's, although she made only two-thirds of his salary. The court's findings were not clearly erroneous.

### Fourth Factor

Section 8–205(a)(4) requires the court to consider "the circumstances that contributed to the estrangement of the parties." The court made the following findings with respect to this factor:

> Considering also the circumstances leading up to the estrangement, first of all, there is the adultery, which is really uncontroverted. And the court is convinced that that is something that is not limited to one or two instances, but it is a general pattern on the husband's

part. In addition, the court is convinced that there was an attitude on Mr. Alston's part in general of marital malaise, for want of a better comment.

Appellant's contention that there was insufficient evidence to support this finding is without merit. As we discussed, *supra,* Herman's admissions of adultery corroborated Viola's testimony and damaged his credibility. Both children testified that Viola raised them, provided for them when they asked, and tried to keep the family together. Both children corroborated Viola's claims that Herman had no real interest in the family. The court's finding was not clearly erroneous.

### *Third Factor*

■ Section 8–205(a)(3) requires the court to consider "the economic circumstances of each party at the time the award is to be made." The court made the following findings with respect to this factor:

> The third factor, the economic circumstances of each, of course, again, the husband's annuity contract. In addition, the court took into consideration the fact that the husband is now in debt, notwithstanding the fact that his income significantly increased as a result of the receipt of the annuity contract. He has no job at the present time, although there isn't anything that should prevent him from working and earning money should he choose to do that.

Section 8–205(a)(3) requires the court to consider the economic circumstances of each party at the time of the award. The evidence, as appellant contends, demonstrates that Herman unwisely spent his money causing him to go deeply into debt. He financed a $50,000.00 car, an $84,-000.00 home mortgage and a $14,000.00 time share unit in Shenendoah Valley, Virginia, all with only a small down payment. He was also required to pay $100.00 per week in temporary alimony. At the time of trial, he was behind in his mortgage payments, time share loan, and alimony payments. On the other hand, the evidence demonstrated that

appellant was soon to receive his next annual D.C. Lotto payment of $44,000.00 and that he was eligible for seventeen more annual payments. Appellant, who had retired, was also physically able to work.

There is sufficient evidence to conclude that appellant, while currently behind in his payments, would soon receive enough money to get back on schedule with his payments. He also had the resources, his future D.C. Lotto payments and his ability to work, to remain on schedule. The court's findings were not clearly erroneous.

### Tenth Factor

Section 8–205(a)(10) allows the court to consider "any other factor that the court considers necessary or appropriate to consider in order to arrive at a fair and equitable monetary award." In addition to the facts listed above, the court also considered the fact that Herman had already received two payments of $44,000.00 from which Viola did not receive any money. Appellant also admitted that he received a lump sum payment of $16,000.00 from his retirement plan from which Viola was excluded.

On our independent review of the record we find credible evidence to support each finding of fact by the court. It is clear from the record that the court weighed each finding of fact before it awarded fifty percent of the remaining D.C. Lotto payments to appellee. The court found that Herman put forth little effort to win the D.C. Lotto, that Viola's contributions to the marriage and the family were significantly greater than those of Herman, that Herman's adultery was a general pattern of behavior, that Herman's present indebtedness was temporary and that Herman had already received payments totalling $104,000.00. We find no abuse of discretion in this award.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.