JAMES B. COLBURN, JR. *v.* MARJORIE B. S.
COLBURN

[No. 524, September Term, 1971.]

*Decided June 29, 1972.*

504

The cause was argued before ANDERSON, MORTON and CARTER, JJ.

*Natalie Zimmerman,* with whom was *Samuel Schenker* on the brief, for appellant.

*Theodore G. Bloom,* with whom were *Albert J. Goodman* and *Goodman, Bloom, Merrill & Lilly* on the brief, for appellee.

CARTER, J., delivered the opinion of the Court.

The appellee, Marjorie B. S. Colburn, instituted suit against her husband, John B. Colburn, Jr. (appellant), in the Circuit Court for Anne Arundel County seeking a divorce a mensa, temporary and permanent alimony, appropriate custody of the minor retarded son of the parties, and counsel fees. She alleged constructive desertion as the ground for her relief. The appellant in his answer denied the material allegations of the bill and filed a cross-bill also seeking a divorce a mensa and custody of the minor son. He alleged actual abandonment and desertion as the ground for his relief. Judge George Sachse, after an extended trial, granted the appellee a divorce a mensa, temporary and permanent alimony in the amount of $7800 a year ($650 monthly), ordered the appellant to pay $3750 to the wife's counsel as part of the legal fees incurred in representing her in this suit and $300 to two medical witnesses who testified for the wife. He dismissed the appellant's cross-bill but awarded him custody of the mentally retarded son, ordered him to support the son, and gave the wife reasonable visitation rights. The appellant (husband) appealed, contending that the chancellor was clearly in error in finding him guilty of constructive desertion and in awarding the appellee temporary and permanent alimony, counsel fees, and witness fees to her expert witnesses.

## FACTS

At the time of their marriage in November 1956 the appellant was a 36 year old bachelor, and the appellee a 33 year old widow with an eight year old son, Larry. In December 1957 their only child, Joey, was born a mongoloid. At that time the husband was the active head

of the Colburn Construction Company in which he was the sole stockholder.

The wife's testimony showed that in 1963 the husband moved out of the master bedroom and into the guest room on a permanent basis, except for infrequent occasions when he would come to her bedroom for sexual relations and thereafter promptly return to the guest room. After May 1967, their sexual relations discontinued entirely although she had repeatedly invited him to sleep with her, but he had consistently refused. She knew of no reason for the discontinuance. She further testified that from 1968 to the separation in 1970, the husband's contribution toward her personal needs, the purchase of groceries, and the cost of a part-time maid was $200 a month. She complained to him about the inadequacy of his support but to no avail. During this period her husband also neglected their social life in that he had repeatedly refused to take her to social activities of her friends and had been practically non-communicative with her when they were at home. In September 1968 he ordered her to leave because she had refused to take his nephew into their home. At that time she visited their family physician, Dr. John Hedeman, informed him of her domestic problems, and inquired about the effect they were having on her health. Later she consulted Dr. Schleifer, a psychiatrist, about her marital problems.

At the suggestion of Dr. Schleifer she ultimately saw an attorney about her frustrations over money matters. Thereafter in October 1969 she filed suit against her husband for an accounting for the income from property jointly owned by them. After suit was filed, her husband's previous attitude of indifference toward her developed into one of outspoken hatred. At that time he ceased eating any meals at their home, became completely non-communicative with her, and refused to give her any money for her personal needs.

On Christmas Day 1969 the tension between the parties came to a head. When the wife offered her husband a present, he refused it and told her the sooner he got

rid of her the better he would like it. He refused to tell her where he was going and as he walked by her on his way out of the house she struck him on top of the head with her hand. He then spat in her face; she slapped him; he returned the slap, grabbed her by the arms, pushed her toward the basement entrance, and repeatedly said to her "get down those steps!" At that time her son Larry came on the scene and directed the husband to release her, which he ultimately did. After Larry left on January 7, 1970, she stayed with a neighbor at night until January 14, 1970, because she was afraid to stay in the house alone with the appellant. On January 14, she procured an apartment and permanently moved from the home. She has remained separated from her husband since that date.

Dr. John Hedeman served as the family physician for both parties for several years. His testimony showed that when he had seen the wife professionally in September 1968, she had complained to him of the complete breakdown of sexual relations between her and her husband since May 1967, the serious and persistent lack of communication between them, the consistent lack of social activities in their married life, and the refusal of the husband to support her properly. Dr. Hedeman regarded her complaints as "realistic and reasonable." He found her to be suffering from a marked anxiety, tension, and depression, and suggested that she effect a trial separation from her husband [1] before she went "batty," meaning before her condition changed "from an anxiety neurosis to, perhaps, a frank psychosis." It was his opinion that she "was on the verge of a serious mental illness * * * as a result * * * of the relationship or lack of it with her husband." After the parties separated he saw the wife on several occasions and found her mental condition to be greatly improved. He attributed the improvement to her living apart from her husband.

---

1. The wife testified she did not follow Dr. Hedeman's advice concerning a trial separation because she did not wish to leave her children at that time.

The testimony of Dr. Carl Schleifer, a psychiatrist, showed that he saw the wife professionally prior to and during September and October 1969. At that time she related to him substantially the same complaints she had related to Dr. Hedeman. He found her to be highly anxious and unhappy to the point that if her condition became much worse, "she might come to require hospitalization for correction." It was his opinion that the cause of her depression and anxiety was the marital discord between her and her husband. He also stated that the husband's conduct toward his wife was of such a nature and extent that it overwhelmed her and in the doctor's opinion, it would have overwhelmed any woman. Dr. Schleifer also saw the husband in October 1969. At that time the doctor related his wife's problems to him and the husband showed no reaction whatever and did not deny them. His response was that his wife's interest in social activities was superficial, that her desire to relate to other people was ridiculous, and that he thought she should be satisfied with their present way of living and concentrate on their home. Dr. Schleifer diagnosed the husband as a "loner" who was very rigid, and who determined things within himself with no regard for other people's opinions. The doctor testified that he believed the major causes of the wife's emotional condition were the lack of communication between her and her husband, his refusal to engage in normal social activities with her, and his failure to support her properly. He further stated that the lack of normal sexual relations was a contributing though not a major cause of her condition.

The testimony of Ann Sindall, sister of the wife, showed that between July 1969 and the separation in January 1970, the appellant telephoned her several times. Mrs. Sindall testified that during these conversations, the husband had said to her:

"[That] he was very furious because she [the wife] had asked him to go somewhere with her and he could not understand this because he said

he had made it absolutely clear that he did not want to be associated with her in any way, he did not want to be seen in her company or have anything to do with her and yet she had the nerve to ask him to take her, I think it was to a dance. On other occasions, he told me that the happiest day of his life would be when she went out that door and kept walking and never came back. On these other times he told me she was crazy, that she was going to have to be put away, that she was a thief, was stealing from their son."

She further testified that when the wife underwent surgery in January 1969, the husband's attitude was one of complete indifference for her welfare. When his wife was brought from the operating room, he looked at her in a contemptuous manner and asked her "why she didn't brush her teeth because they were dirty." Mrs. Sindall's testimony further showed that the appellant went to the Bahamas in his boat about a week after his wife returned home from her operation and while she was still recuperating. She further stated that the parties had lived apart continuously since January 1970.

Larry Seidl, the 22 year old son of Mrs. Colburn, corroborated his mother's testimony in respect to the incident that occurred on Christmas Day 1969 and also that the husband had moved into a separate bedroom on a permanent basis in 1963. He further stated that the appellant had had a private conference with him the day after Christmas 1969 and had then told him that his mother was an alcoholic, was crazy, and was a thief.

The testimony of the appellant showed that when his wife had a hysterectomy operation in January 1969, she advised him that she would be "out of operation" for a year [2] and consequently, that he had had no sexual rela-

---

2. The wife denied having made the statement. Dr. Hedeman testified that ordinarily a hysterectomy operation disables a woman from sexual relations for no more than six weeks after the operation.

tions with her from December 1968 until the separation in January 1970. He denied that he had refused to have sexual relations with her. He also said he had slept in the same bedroom with her about 50 per cent of the time since 1964 and had not moved out of her bedroom permanently until December 1968 when he was required to do so because of her loud snoring and her bleeding problem. In respect to the financial situation, he pointed out that his wife had income of her own from securities left her by her first husband. He stated that he and his wife did go out socially occasionally, but since he worked ten to twelve hours a day, he did not desire to go out often. He further said he had taken his wife on trips to Europe, Canada, Florida, and annually, to Ocean City, Maryland, and had shown his affectionate feelings toward her by placing all his property in their joint names. He admitted that after his wife filed suit for an accounting in October 1969, he became very bitter in his feelings toward her, had very little communication with her, and had eaten all his meals away from home. His version of the incident on Christmas Day 1969 was that his wife became furious because he had taken the whiskey with which she was intending to make eggnog. She struck him on the head with her hand and then slapped him. He then slapped her back, grabbed her by the arms and pushed her against the wall. At that time he told Larry to calm her down and left the house.

The appellant further testified that he had resigned as president of his construction company in January 1970 and gone into partial retirement because of his hypertension.[3] He was then 51 years old. He also stated that after this divorce suit was filed he had transferred all his stock in the company (100 percent), which was then valued at approximately $200,000, to his nephew George Clark, for $1. In consideration of this transfer Clark had agreed to take care of his son Joey as long as Joey lived but there was no formal writing to this effect.

---

3. Dr. Hedeman testified the appellant had no physical problems that required him to resign as president of the company in January 1970. The divorce suit was filed January 20, 1970.

The testimony of Edward Mullen, C.P.A., showed that the husband was paid an annual salary as president of his company in 1969 of $49,870. After he resigned in 1970, his annual salary for acting in an advisory capacity to the company was reduced to $10,400. His total income for 1970, including his salary, amounted to $15,652 before taxes. The net profits earned by the company after taxes in 1968 were $35,000, in 1969, $30,000 and in 1970, $29,000. These profits were allowed to accumulate and were not distributed as dividends. He further stated that the wife's tax return for 1970 reflected the payment to her of dividends from stock and interest in the amount of $4311 from her individually owned securities plus $7800 that was paid her as alimony.

The testimony of both Mrs. Jacqueline Spell, a divorcee and friend of Mr. Colburn, and Mrs. Agnes Clark, his sister, was that the wife was a constant complainer and that her husband could never do anything to please her.

## CONSTRUCTIVE DESERTION

In speaking of the proof necessary to establish constructive desertion the Court of Appeals in *Murphy v. Murphy*, 248 Md. 455 (1968) said at page 460:

> "Even though the cruelty required in a constructive desertion case may be less than a case wherein an *a mensa* decree is sought on the grounds of cruelty, yet, the objectionable conduct still must be such as to render continuation of the marital relationship impossible, if the complaining spouse is to preserve his or her health, safety or self-respect. *Eberwein, supra,* [193 Md. 95]. Obviously, for such a situation to exist, *there must be a pattern of persistent conduct which is detrimental to the safety or health of the complaining spouse, or so demeaning to his or her self-respect as to be intolerable.* * * *" (emphasis supplied.)

In order for the testimony of the wife to be legally sufficient to establish constructive desertion as a ground for divorce, it must be adequately corroborated as to both the acts of misconduct and their adverse effect upon her health, safety, or self-respect. Md. Code, Art. 35, § 4. In *Styka v. Styka,* 257 Md. 464, the Court of Appeals held that the corroboration required in a genuinely contested divorce case may be slight. See also *Smith v. Smith,* 257 Md. 263. In *Deck v. Deck,* 12 Md. App. 313, 319, this Court held that since the deletion of Md. Rule S75, the corroboration "may now again come from the other spouse." In speaking of the corroboration necessary to establish an unjustified refusal of sexual relations as a basis for divorce, the Court of Appeals said in *Lent v. Lent,* 202 Md. 240 at 245, that where the suit was contested "only slight corroboration of the refusal is required." See also *Mower v. Mower,* 209 Md. 413, 417 and cases cited.

The testimony of the wife if believed showed that she had been the victim of persistent marital misconduct by her husband for more than two years prior to the separation in that he had deprived her of 1) a normal marital sex life by repeatedly refusing her request that he have sexual relations with her, 2) normal communications between a husband and wife with no communications for two months immediately prior to the separation, 3) normal social activities of married persons and 4) adequate support in accordance with his financial ability. Her first contention is corroborated by the admissions of the husband that he had had no sexual relations with his wife for more than a year prior to the separation, the *fact* that the wife complained to the doctor for both parties (Dr. Hedeman) more than a year prior to the separation that there had been a complete breakdown of sexual relations between the parties, the testimony of Mrs. Sindall to the effect that the husband had told her several months prior to the separation that he wanted nothing whatever to do with his wife, and Larry's testimony that the husband had moved out of his wife's bed-

room on a permanent basis in 1963. The wife's claims in respect to the lack of communication between her and her husband and his refusal to afford her normal social activities are corroborated by the testimony of Mrs. Sindall concerning the admissions of the husband to her of his intention not to engage in communications or social activities with his wife. The wife's claim of a lack of proper support is corroborated by the admissions of the husband that for a considerable period prior to October 1969 the extent of his contribution to her personally and for the purchase of groceries and maid costs was $200 per month from the income of mortgages owned by him and his wife as tenants by the entireties.[4] He further admitted that after October 1969 he contributed nothing toward her personal needs.

There is considerable conflict between the testimony of the wife and her supporting witnesses and that of the husband and his supporting witnesses as to the conduct of the husband toward his wife prior to the separation. Md. Rule 1086 provides that where an action is tried by the lower court without a jury, this Court will not set aside the judgment of the lower court on the evidence unless it is clearly erroneous. In applying this Rule we have interpreted it to mean that it is for the trier of the facts to determine the credibility of the witnesses, that due regard will be given to the opportunity of the lower court to judge their credibility, and that we will not substitute our judgment for that of the lower court on its findings of fact but will only determine whether those findings are clearly erroneous in the light of the total evidence. See *David v. State,* 1 Md. App. 666 (1967) ; *Folk v. State,* 11 Md. App. 508 (1971) ; and *Nichols v. State,* 5 Md. App. 340.

The chancellor found that the conduct of the husband as described in the wife's complaints 1), 2), 3), and 4)

4. The undisputed evidence showed that the husband's salary, the net earnings of his solely owned company after taxes, and bonus paid him amounted to approximately $90,000 during the year 1969.

above had been fully established and amply corroborated and that such actions on his part amounted to marital misconduct. Applying the Rule, as we have interpreted it, to the total evidence we hold that he was not clearly in error in so finding. He further found that the testimony of Drs. Hedeman and Schleifer fully established that this persistent misconduct of the husband toward his wife was adversely affecting her mental health to the extent that it was necessary she separate from him if she was to avoid an imminent mental breakdown. We conclude that he was likewise not clearly in error in this finding and in awarding her a divorce a mensa on the ground of constructive desertion.

## ALIMONY

Md. Code, Art. 16, § 3 provides that alimony may be awarded in cases where a divorce is decreed. In defining the nature of alimony, this Court speaking through Chief Judge Murphy, said in *Quinn v. Quinn*, 11 Md. App. 638 at 643-644:

"Maryland Code, Article 16, § 5, directs that the court not award alimony 'unless it shall appear from the evidence that the wife's income is insufficient to care for her needs.' It is thus altogether plain that alimony is not to be awarded as a punitive measure. *Bowis v. Bowis*, 259 Md. 41. Rather, it is an allowance to the wife in recognition of the husband's common law liability to support her; * * *. It was held in *Waters v. Waters*, 191 Md. 436, that in determining an award of alimony and whether, under the statute, the wife's income 'is insufficient to care for her needs,' the court should consider the husband's wealth and earning capacity, the assets and income of the wife, the station in life of the parties, their age, physical condition, and ability to work, the length of time the parties lived together, the circumstances leading up

to the divorce, and the fault which destroyed the home. To the same effect, see *Burton v. Burton,* 253 Md. 233; *Newmeyer v. Newmeyer,* 216 Md. 431. *The husband's overall financial ability to support (and not merely his current income), and the wife's need for support are controlling factors. Willoughby v. Willoughby,* 256 Md. 590; *Pet v. Pet,* 238 Md. 492; *Gosnell v. Gosnell,* 208 Md. 179; *Lopez v. Lopez,* 206 Md. 509. In view of the variable factors to be considered in determining the alimony award, no fixed rule exists whereby the amount of the award is based on a percentage of the husband's wealth or income. *Bowis v. Bowis, supra.* Because each factual situation in determining an award of alimony is unique, making inappropriate the application of any mechanical or rigid formula, the Chancellor is necessarily entrusted with wide discretion which should not be disturbed on appeal unless it was arbitrarily used or his judgment clearly wrong. *Blumenthal v. Blumenthal,* 258 Md. 534; *Willoughby v. Willoughby, supra."* [emphasis supplied.]

It has been repeatedly held by the Court of Appeals that the award of alimony should be based in part at least on the earning capacity and financial worth of the husband at the time of trial. See *Chalkley v. Chalkley,* 240 Md. 743, 744; *Kapneck v. Kapneck,* 235 Md. 366, 368; *Pet v. Pet, supra.* As we said in *Quinn, supra* at page 643, "[t]he husband's overall financial ability to support and not merely his current income" is one of the controlling factors in determining an award of alimony. The chancellor found that the purpose of the husband in retiring as president of his company and surrendering the lucrative salary incident thereto immediately after the separation and transferring all the stock in his company to his nephew during the pendency of this suit was to voluntarily impoverish himself so as to fraudulently de-

prive his wife of her claim for alimony.[5] Based on these findings of fact he ruled that the former salary and stock holdings of the husband should be considered in determining his *earning capacity* and *actual wealth* at the time of trial. We hold that he was not clearly in error in these findings of fact nor in error in his ruling that such findings should be considered in determining the amount of alimony to be awarded. On this point it is stated in 24 Am. Jur.2d, Divorce and Separation § 632:

> "Where the husband has voluntarily relinquished a well-paying practice and has taken a position at a modest salary the court may base the amount of alimony upon his capacity to earn money, or upon his prospective earnings. * * *"

In respect to the needs of the wife for support, the chancellor found that the sum of $12,300 a year was a reasonable and appropriate amount considering the husband's "overall financial ability to support [her] and not merely his current income." After a careful consideration of the record, including an itemized statement by the wife of her needs, we fail to find that the chancellor was clearly in error in so finding.[6] It is conceded that the wife's income before taxes in 1970 amounted to $4311 exclusive of alimony received. The chancellor found that her annual income could be reasonably projected at about $4500 before taxes. Md. Code, Art. 16, § 5 provides that alimony shall only be allowed to the extent that "the wife's income is insufficient to care for her needs." Ap-

---

5. The wife filed a supplemental petition in the instant case alleging that since the institution of this suit, the appellant had transferred all the stock in his company valued at $200,000 to his nephew in fraud of her right to alimony and prayed the transfer be set aside. The assignee and the company were made parties defendant to the petition. The petition has not been determined on its merits. However, since the wife took no appeal, the failure of the chancellor to decide the petition is not before us for review. Md. Rule 1085.

6. The figure of $12,300 a year was substantially equivalent to the figure submitted by the wife in an itemized statement of her yearly needs. She did not appeal from the decree and therefore has no standing to complain that the amount of alimony is inadequate.

plying the statute to these facts, the chancellor deducted the wife's projected annual income of $4500 from the $12,300 thereby arriving at the net figure of $7800 per annum as an appropriate alimony award. We hold that the evidence before the chancellor at the time of the trial was legally sufficient to support this finding and that he did not clearly err in so ruling.[7]

## COUNSEL FEES

In awarding counsel fees to the wife, the chancellor required the husband to pay $3750 toward such costs. Counsel for the wife represented to the court that he had spent 57 hours out of court and eight full days in court in representing the wife in this divorce action. He claimed that a reasonable basis of compensation for his services amounted to $40 an hour for his out-of-court time and $300 a day for his in-court services or a total amount of $4680. Md. Code, Art. 16, § 5 also provides that the court shall not award counsel fees "unless it shall appear from the evidence that the wife's income is insufficient to care for her needs."

In *Waters v. Waters, supra,* the Court of Appeals said at page 441:

> "* * * [C]ounsel fees should be awarded according 'to the ordinary factors of labor, skill, time, and benefit.' The amount of the fee also cannot be wholly disassociated from the financial resources of the party charged. * * *"

See also *Lopez v. Lopez, supra; Bennett v. Bennett,* 197

---

7. The wife's suit against her husband for an accounting of the income from assets jointly owned by them was pending at the time of the passage of the decree in the instant case and was finally determined by the Court of Appeals in *Colburn v. Colburn,* 265 Md. 468 (1972). This income was therefore not considered by the chancellor in fixing the amount of alimony. However, it can of course be considered upon a subsequent petition filed by either party for a modification of the award if either decides that the payment of substantially the same amount of additional income to each party warrants further consideration by the court.

Md. 408, 416. In *Danziger v. Danziger*, 208 Md. 469, the Court said at page 475:

> "* * * The amount of the award of counsel fees is within the discretion of the chancellor and, although his discretion is subject to review by this Court, the award should not be disturbed unless he exercised his discretion arbitrarily or his judgment was clearly wrong. * * *"

Applying *Waters, supra; Danziger, supra* and Art. 16, § 5 to the facts of the instant case, the chancellor found that the husband should pay $3750 of the $4680 fee for legal services rendered the wife. He was given credit for a previous payment of $250, which resulted in a net amount due by him to the wife's counsel of $3500. In the circumstances of this case, including the time expended in the preparation and trial, the benefit accomplished, and the earning capacity and financial resources of the parties at the time of trial, we fail to find that the chancellor acted arbitrarily or that he was clearly wrong in requiring the husband to pay $3750 to his wife's counsel.

## SUIT MONEY

In speaking of the wife's right to require her husband to pay "suit money" when she is without funds to enable her to carry on or defend a divorce suit, the Court of Appeals in *Rubin v. Rubin*, 233 Md. 118 said at page 126:

> "* * * The principle of the more persuasive decisions * * * (particularly in Maryland and New York) indicate that the expense of services rendered before suit is instituted, * * * may be included in suit money allowable to a wife where such expenses are reasonable and necessary to bringing or *carrying on the suit*."
> (emphasis supplied.)

Under the rationale of *Rubin, supra* it seems clear that

those expenses which are reasonable and necessary to *carrying on the suit* as well as those necessary for preliminary investigative purposes are properly classified as "suit money" in a divorce case and are payable by the husband to the same extent as counsel fees under the provisions of Md. Code, Art. 16, § 5. The chancellor found that the services of the two medical experts were necessary in order for the wife to adequately present her case and their charges of $75 and $225 respectively for their appearance in court were reasonable. We find no sufficient reason to say that he was clearly in error in so finding and requiring the husband to pay these charges.

*Decree affirmed.*
*Costs to be paid by the appellant.*