514 A.2d 25

**A.S. ABELL PUBLISHING COMPANY**

v.

**BOARD OF REGENTS OF the UNIVERSITY OF MARYLAND, et al.**

**No. 748, Sept. Term, 1986.**

Court of Special Appeals of Maryland.

Sept. 5, 1986.

Douglas D. Connah, Jr. (Kathleen M. McDonald and Venable, Baetjer and Howard, on brief), Baltimore, for appellant.

Andrea Hill, Asst. Atty. Gen. (Stephen H. Sachs, Atty. Gen. and Mary L. Preis, Asst. Atty. Gen., on brief), Baltimore, for appellees.

Argued before GILBERT, C.J., and WILNER and ADKINS, JJ.

GILBERT, Chief Judge.

After an emergency hearing, this Court issued the following order:

> For reasons to be stated in an opinion to be hearafter filed, it is this 8th day of August, 1986, by the Court of Special Appeals,
>
> ORDERED that the judgment of the Circuit Court for Prince George's County is affirmed. Costs to be paid by the appellant. Mandate to issue forthwith.

We now explain why we issued that order.

Leonard Bias was a University of Maryland basketball player of some renown. His cocaine-related death pushed him out of the sports section of newspapers and on to the front page. Mr. Bias's academic achievements reportedly

did not match his athletic prowess. The revelation of his scholastic shortcomings coupled with his death from cocaine ingestion led to a hue and cry for reform. Two inquiries were commenced. The State's Attorney for Prince George's County began a probe into possible criminal violations by persons other than Mr. Bias. The University acting through its Chancellor, John B. Slaughter, appointed dual task forces.[1] The only one with which we are concerned is that dealing with the "Academic Achievement of Student-Athletics."[2] The task force on Academics was divided into five subcommittees. Those subcommittees refused to open their meetings to the general public. Aggrieved at what it perceived to be a denial of "the public's right to know" and its right to report the happenings at the subcommittee meetings, A.S. Abell, publishers of *The Baltimore Sun,* filed an action in the Circuit Court for Prince George's County against the Board of Regents of the University of Maryland and the Task Force on Academics. The publisher sought a prohibitory injunction to preclude the subcommittee's holding closed meetings. Judge Audrey E. Melbourne denied the publisher relief, and this appeal ensued.

The "Stipulation of Facts" in this Court is:

"1.  The University of Maryland is created by statute as a body corporate and agency of the State of Maryland, pursuant to Md. Educ. Code Ann. § 13–101.

2.  The Board of Regents of the University of Maryland is created by statute and is vested with the governance of the University of Maryland, pursuant to Md. Educ. Code Ann. § 13–102.

3.  Allen L. Schwait is the Chairman of the Board of Regents and has authority to speak on its behalf.

---

1.  Both task forces are concerned with matters pertaining to the University's College Park campus.

2.  The other task force is styled "Task Force on Drug Policies, Enforcement and Education."

4. On June 30, 1986, the Board of Regents met in what it has characterized as an 'executive session.'

5. A quorum of the Board of Regents was present at the meeting held on June 30, 1986.

6. John B. Slaughter is the Chancellor of the University of Maryland at College Park.

7. ... Chairman Schwait on June 30, 1986 at a press conference following the Board of Regents' meeting [read a statement concerning the meeting and the Task Forces].

8. ... John B. Slaughter, Chancellor, University of Maryland, College Park, [gave a statement to the press] following the Board of Regents' meeting.

9. [A copy of Dr. Slaughter's] ... 'Charge To The Task Force On Academic Achievement of Student-Athletes At the University of Maryland College Park' [was made public]....

10. The Task Force on Academics is divided into five sub-committees, or 'working groups.'

11. The breakdown of the 'working groups' of the Task Force On Academics is as follows: (1) Intercollegiate Athletics—Mission, Goals, Structure of Department of Intercollegiate Athletics; (2) Recruitment, Admissions, Orientation, and Freshman Athletics; (3) Academic Support Programs, Policies, and Problems for Student-Athletes; (4) Non-Academic Support Programs, Policies and Programs for Student Athletes, and (5) Students, Coaches, Athletic Department Officials, and Booster Organizations—Their Roles, Responsibilities and Problems.

12. The breakdown of the five working groups corresponds to the five issues, or areas of inquiry, on which the Task Force on Academics is to focus, as set forth in Dr. Slaughter's Statement ... and in [his] Charge To The Task Force.... The Task Forces may also enlarge their focus.

13. The Task Force on Academics is to report its results in these five areas of inquiry to Dr. Slaughter by September 30, 1986.

14. The sub-committees of the Task Force on Academics refused to open to the public their meetings held on July 28, 1986.

15. The Task Force on Academics has taken the position that sub-committee meetings are under no obligation to be open to the public.

16. The Task Force has taken the position that any meetings of the Task Force on Academics as a whole, as a matter of policy only, will be open to the public in accordance with provisions of the Open Meetings Act, Md. State Gov't Code Ann., § 10–501 *et seq.* "

Abell poses two questions to us:

1) Are the Task Force on Academics and its subcommittees public bodies within the meaning of the Maryland Open Meetings Act?

2) Does the appellees' refusal to allow Abell to attend subcommittee meetings constitute a violation of the First Amendment to the Constitution of the United States and Article 40 of the Maryland Declaration of Rights?

## I.

■ Abell's argument that the Task Force on Academics is a public body within the ambit of Md. State Gov't Code Ann. § 10–501(g) is grounded in the belief that it was created by "a rule, resolution, or bylaw" of the Board of Regents. The record before us does not support Abell's supposition.

■ Indubitably, the Board of Regents is a public body. It is created by statute and vested with the governance of the University of Maryland. Md. State Gov't Code Ann. § 10–501(g) and Md. Educ. Code Ann. § 13–102.

The record contains testimony from Allen Schwait, Chairman of the Board of Regents. He testified that Chancellor Slaughter appeared before the Board and informed it that he had recommended the establishment of two task forces. Under the Slaughter recommendation, the two forces, con-

sisting of personnel appointed by the Chancellor, would inquire into separate areas concerning drug involvement by students. The Academic Task Force was directed to delve into five areas, *videlicit*:

"Do the policies and procedures for student-athletes at the College Park Campus clearly support the academic philosophy and goals of the institution?

Are the role and the responsibilities of student-athletes, coaches, and athletic department officials clearly defined?

What policies, procedures, and programs are in place for the recruitment, admission, and orientation of student-athletes? Are these adequate?

What policies, procedures, and programs for academic and nonacademic support and guidance of the student-athlete both before and after enrollment are in place? Are these adequate?

In what way are the academic and co-curricular components of the Campus integrated into and supportive of the athletic program?"

A subcommittee was appointed to deal with each of those five areas.

Mr. Schwait told Judge Melbourne that the Board did not adopt any formal resolution concerning Dr. Slaughter's recommendations, but that there was a consensus agreement. The minutes of the Board, which were examined *in camera* by Judge Melbourne, bear out Mr. Schwait's testimony.

Additional testimony by Mr. Schwait established that the task forces were to report directly to Dr. Slaughter who in turn would report to Dr. Toll, the President of the University. Dr. Toll would then make his report to the Board.

The evidence showed that the management of the campus was largely in the hands of Chancellor Slaughter, who had "wide discretion in making policy decisions" with respect to the campus. Dr. Slaughter, according to the testimony, is empowered to appoint task forces which report to him. His appearance before the Board of Regents seems to have

been for the purpose of informing the Board of his plan and seeking guidance rather than requesting formal approval. The Chancellor was already authorized *ex officio* to do exactly as he told the Board he intended to do. At a news conference following his appearance before the Board, Dr. Slaughter announced that

[t]he problems surrounding student-athletes involved in intercollegiate athletics have concerned me for some time, and as Mr. Schwait said, we have reviewed these problems and put programs in place to address some of them over the past few years and prior to Leonard Bias' death. Nevertheless, as Chancellor of the College Park Campus and Chair of the NCAA Presidents Commission, I believe that all major universities, particularly public ones, have an obligation to examine and strengthen the relationship between the athletic and the academic components of the institution. Therefore, I am directing a Task Force on Academic Achievement of Student-Athletes to conduct a comprehensive review of the academic and nonacademic support for student-athletes at College Park.

Significantly, the Chancellor's statement is couched in the first person singular and not in terms of Board action.

We stress the Chancellor's actions because if the Task Forces and subcommittees are those of Dr. Slaughter rather than those of the Board, the "Public Meeting statute," State Government Article §§ 10–501 through 10–510, is inapplicable.

After viewing the exhibits,[3] hearing the testimony of Mr. Schwait and examining *in camera* the minutes of the Board of Regents, Judge Melbourne said:

---

**3.** The exhibits consisted of
  1. Press conference statement by Mr. Schwait in his capacity as Chairman of the Board of Regents.
  2. Press conference by Chancellor Slaughter.
  3. Charge to Task Force on Academic Achievement of Student Athletes—College Park. (Charges of the various subcommittees are included).

"The Court does not, for one minute, believe, and I so hold, that the Open Meetings Act applies to the task forces that have been created by the Chancellor. He does this routinely.

In this particular case, the University has graciously agreed to supply the news media, in the guise of public information what the task forces are talking about, what they are meeting about.

But I find and I hold that the task forces is an investigatory body, and any investigation on the campus under the province of the Chancellor are not subject to the Open Meetings Act.

Therefore, certainly any subcommittees of the task forces would not be covered by the Open Meetings Act."

Although Judge Melbourne did not explicitly say that the Task Forces in the instant case were appointed by Dr. Slaughter, that is the clear implication of her fact-finding.

When a case has been tried before the court without a jury, the trial judge's fact-finding will not be set aside unless it is clearly erroneous. Md. Rule 1086. We are not at liberty to substitute our judgment on the facts for those of the trial court. *Courtney v. Richmond,* 55 Md.App. 382, 462 A.2d 1223 (1983); *In re Trevor,* 55 Md.App. 491, 462 A.2d 1245 (1983); *Colburn v. Colburn,* 15 Md.App. 503, 292 A.2d 121 (1972); *Ritter v. Danbury,* 15 Md.App. 309, 290 A.2d 173 (1972). We are unable to declare that Judge Melbourne's findings on the evidence were "clearly erroneous."

---

4. A letter dated June 24, 1986, from Dr. Knorr of the State Board of Education to Dr. Toll.

5. Notice of a "Special Meeting of the Board of Regents." The notice is dated June 25, 1986.

6. Minutes of the Board of Regents' June 30, 1986, Executive Session, which aside from listing attendance merely states that the Board agreed "unanimously" to meet in executive session.

Abell places great emphasis on the letter from Dr. Knorr to the Board. The record indicates, however, that the letter was ignored by Mr. Schwait and the Board.

## II.

■ We turn now to Abell's second issue. Abell asserts that even if the Public Hearing law is inapplicable, appellant is nevertheless entitled under the First Amendment and Article 40 of the Maryland Declaration of Rights to be present at the subcommittees' meetings.

To bolster its position Abell relies principally on *Society of Professional Journalists v. Secretary of Labor*, 616 F.Supp. 569 (D.Utah, 1985). In that case the Mine Safety and Health Administration (MSHA) conducted hearings into a mine disaster in which twenty-seven people perished. The United States District Court conceded that the MSHA hearings did not have the traditional openness usually associated with a court trial. In ruling in favor of the media, the court stressed the "watchdog" role of the press and public when proceedings are openly conducted. We think the *Society of Professional Journalists v. Secretary of Labor* to be inapposite. The case dealt with hearings at which sworn testimony was taken and transcribed verbatim by a court reporter. That is most certainly not the situation in the matter *sub judice*. The meetings conducted by the subcommittees of the Academic Task Force are not hearings. Insofar as the record before us reveals, no testimony sworn or unsworn was to be taken.

We are unaware of any law that requires the admission of the press at private meetings, and, therefore, the press was not entitled as a matter of constitutional right to attend the meetings of the various subcommittees.

We, therefore, affirmed the judgment.