No. 03-239

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 120

THE ASSOCIATED PRESS, BOZEMAN DAILY CHRONICLE,
THE MONTANA STANDARD, MISSOULIAN, GREAT FALLS
TRIBUNE, MONTANA NEWSPAPER ASSOCIATION, MONTANA
BROADCASTERS ASSOCIATION, THE BILLINGS GAZETTE, THE
DAILY INTER LAKE, MONTANA TELEVISION NETWORK, EAGLE
TELEVISION NETWORK, HAVRE DAILY NEWS, HELENA
INDEPENDENT RECORD, and YELLOWSTONE NEWSPAPERS,

        Plaintiffs and Respondents,

    v.

RICHARD A. CROFTS, in his official capacity as Montana
Commissioner of Higher Education,

        Defendant and Appellant.

APPEAL FROM:    District Court of the First Judicial District,
                In and for the County of Lewis and Clark, Cause No. CDV-2002-114,
                The Honorable Thomas C. Honzel, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

            Leroy H. Schramm (argued), Montana University System, Helena, Montana

        For Respondents:

            Ronald F. Waterman, Laura D. Vachowski (argued), Gough, Shanahan, Johnson & Waterman, Helena, Montana

        For Amicus Montana School Boards Association:

            Elizabeth A. Kaleva, Montana School Boards Association, Helena, Montana

        For Amicus State of Montana:

            Hon. Mike McGrath, Montana Attorney General; Chris D. Tweeten, Chief Civil Counsel; Brian M. Morris, Solicitor, Helena, Montana

                   Argued and Submitted:  September 25, 2003
                             Decided:  May 4, 2004

Filed:

                              Clerk

Justice John Warner delivered the Opinion of the Court.

¶1	The Respondents, members of the print and television media, filed a complaint against Appellant Richard A. Crofts in the First Judicial District Court, Lewis and Clark County. The complaint alleged that meetings between Crofts and other employees of Montana's University System were subject to Montana's open meeting laws. Crofts and the Respondents filed cross-motions for summary judgment. The District Court granted the Respondents' summary judgment motion, and awarded the Respondents their attorneys' fees and costs. Crofts appeals. We affirm in part and reverse in part the judgment of the District Court.

¶2	We restate the issues on appeal as follows:

¶3	1. Did the District Court err when it concluded that meetings between senior employees of the University System were subject to Article II, Section 9, of the Montana Constitution and Montana's open meeting laws?

¶4	2. Did the District Court correctly award the Respondents their attorneys' fees?

**FACTUAL AND PROCEDURAL BACKGROUND**

¶5	Montana's University System is a public education system supervised and controlled by the Board of Regents of Higher Education (the Board of Regents). Art. X, Sec. 9, Mont. Const.; § 20-25-301, MCA (2001); *Kottel v. State*, 2002 MT 278, ¶ 5, 312 Mont. 387, ¶ 5, 60 P.3d 403, ¶ 5. One of the responsibilities of the Board of Regents is to hire the Commissioner of Higher Education, who serves as the chief executive officer of the University System. The Board of Regents also prescribes the Commissioner's official duties.

2

Art. X, Sec. 9(c), Mont. Const. One of the Commissioner's official duties is to act as the person through whom all matters are presented to the Board of Regents, including reports, recommendations and suggestions from the different units of the University System.

¶6 At all times relevant to the instant case, Crofts was Montana's Commissioner of Higher Education. During the period between June 30, 1999, and December 7, 2001, Crofts held fourteen meetings with a group of upper-level employees of the University System, such as University presidents and chancellors. For its first twelve meetings, this group referred to itself in its agendas as the Policy Committee. Then, the Committee's name was changed to the Senior Management Group. The meetings were called by Crofts to discuss issues directly related to the operation of the University System. Crofts also used the meetings to seek input from Committee members on proposed actions within the realm of his authority. The various members of the Policy Committee attended the meetings in their official capacity as upper-level University employees and were compensated for their attendance with public funds.

¶7 The fifteenth meeting between Crofts and the Policy Committee was scheduled for February 1, 2002. However, before such meeting could commence, a reporter for the Associated Press entered the meeting room and requested to observe, and report on, the meeting. Crofts declined this request. The reporter refused to leave. Crofts then canceled the meeting.

¶8 On February 8, 2002, the Respondents filed a complaint against Crofts, in his official capacity as Montana's Commissioner of Higher Education. The complaint sought a

declaration that the meetings between Crofts and the Policy Committee were subject to Montana's open meeting laws. The complaint also sought an order enjoining Crofts from excluding the public from such meetings.

¶9 Crofts moved for summary judgment on the Respondents' complaint on August 9, 2002. The Respondents filed a cross-motion for summary judgment that same day. The District Court conducted a hearing on the motions on November 13, 2002. On January 3, 2003, the District Court issued its order, granting the Respondents' summary judgment motion, and denying Crofts' summary judgment motion.

¶10 On January 9, 2003, the Respondents filed a motion requesting that they be awarded attorneys' fees. The District Court conducted a hearing on the motion for attorneys' fees on February 25, 2003. Crofts filed a notice of appeal on March 11, 2003. On April 3, 2003, the District Court granted the Respondents their attorneys' fees and costs. Crofts then filed an amended notice of appeal on April 7, 2003.

## STANDARD OF REVIEW

¶11 Our review of a district court's grant or denial of a motion for summary judgment is *de novo*. *Hickey v. Baker School Dist. No. 12*, 2002 MT 322, ¶ 12, 313 Mont. 162, ¶ 12, 60 P.3d 966, ¶ 12. Therefore, we apply the same Rule 56, M.R.Civ.P., criteria as applied by the district court. *Hickey*, ¶ 12. Pursuant to Rule 56, M.R.Civ.P.:

> The movant must demonstrate that no genuine issues of material fact exist. Once this has been accomplished, the burden then shifts to the non-moving party to prove, by more than mere denial and speculation, that a genuine issue does exist. Having determined that genuine issues of fact do not exist, the court must then determine whether the moving party is entitled to judgment as a matter of law. We review the legal determinations made by a district court as to whether the court erred.

4

*Hickey*, ¶ 12.

¶12    On appeal, Crofts contests neither the fact that the Respondents incurred attorneys' fees nor that the amount fixed by the District Court was reasonable. This Court generally reviews a district court's award of attorneys' fees for an abuse of discretion. *In re Marriage of Steinbeisser*, 2002 MT 309, ¶ 18, 313 Mont. 74, ¶ 18, 60 P.3d 441, ¶ 18. However, in this case, Crofts' challenge of the District Court's award of attorneys' fees is purely legal. That is, Crofts alleges that because the District Court failed to make a ruling on the Respondents' motion for attorneys' fees within 60 days, the motion was deemed to be denied. Thus, because there are no factual issues concerning the award of attorneys' fees, the question of whether the award of attorneys fees' was proper is one of law. We review a district court's conclusions of law to determine whether the court's interpretation of the law is correct. *Brumit v. Lewis*, 2002 MT 346, ¶ 12, 313 Mont. 332, ¶ 12, 61 P.3d 138, ¶ 12.

## DISCUSSION

### ISSUE 1

¶13    Did the District Court err when it concluded that meetings between senior employees of the University System were subject to Article II, Section 9, of the Montana Constitution and Montana's open meeting laws?

¶14    Crofts maintains that the District Court erred when it concluded that the Policy Committee's meetings were subject to Montana's open meeting laws. The Respondents counter that the District Court's decision was proper, as Article II, Section 9, of the Montana Constitution and the open meeting laws apply to the type of meetings at issue in this case.

¶15    Article II, Section 9, of the Montana Constitution provides:

5

No person shall be deprived of the right to examine documents or to observe the deliberations of all public bodies or agencies of state government and its subdivisions, except in cases in which the demand of individual privacy clearly exceeds the merits of public disclosure.

The above provision, commonly referred to as the "Right to Know" provision of the Montana Constitution, has been implemented primarily through Montana's open meeting laws, located at §§ 2-3-201 through -221, MCA (2001). *Common Cause v. Statutory Committee* (1994), 263 Mont. 324, 329, 868 P.2d 604, 607. The legislature created the open meeting laws with the intent that the deliberations of the public agencies of this State be conducted openly. Section 2-3-201, MCA (2001). To that end, the provisions of the open meeting laws are to be liberally construed. Section 2-3-201, MCA (2001).

¶16     Section 2-3-203(1), MCA (2001), which addresses the types of meetings subject to the open meeting laws, provides:

All meetings of public or governmental bodies, boards, bureaus, commissions, agencies of the state, or any political subdivision of the state or organizations or agencies supported in whole or in part by public funds or expending public funds must be open to the public[.]

¶17     We have previously determined that, in the context of § 2-3-203(1), MCA (2001), the phrase "public or governmental bodies" means a group of individuals organized for a governmental or public purpose. *Common Cause*, 263 Mont. at 330, 868 P.2d at 608; *Bryan v. District*, 2002 MT 264, ¶ 25, 312 Mont. 257, ¶ 25, 60 P.3d 381, ¶ 25. Therefore, pursuant to § 2-3-203(1), MCA (2001), any group of individuals organized for a governmental or public purpose must allow their meetings to be open to the public.

¶18     In past cases, this Court has concluded that various types of committees created by

6

government entities to perform some type of function were public or governmental bodies required to open their meetings to the public.  See *Common Cause*, 263 Mont. at 330, 868 P.2d at 608 (in which we held that a committee created by statute to assist in the governor's selection of a Commissioner was a public or governmental body subject to the open meeting laws); *Bryan*, ¶ 26 (in which we held that a committee created by a school district to research a proposition and submit a recommendation to the school board was a public or governmental body subject to the "Right to Know" provision of the Montana Constitution); and *Great Falls Tribune Co., Inc. v. Day*, 1998 MT 133, ¶ 18, 289 Mont. 155, ¶ 18, 959 P.2d 508, ¶ 18 (in which we held that a committee created by the Department of Corrections to screen proposals for the construction of a private prison was a public body subject to the "Right to Know" provision of the Montana Constitution).

¶19     In this case, while the Policy Committee was not formally created by a government entity to accomplish a specific function, we agree with the District Court that the committee in question, whether it was called the Policy Committee or the Senior Management Group, was organized to serve a public purpose.  The Policy Committee met fourteen times over two and a half years to discuss matters directly related to the governance of the University System.  The Committee deliberated on issues relating to, *inter alia*: (1) policy changes; (2) tuition and fee changes; (3) budgeting issues; (4) contractual issues; (5) employee salaries; and (6) legislative initiatives.  The Policy Committee also advised Crofts on matters related to his duties as the Commissioner of Higher Education.  How the University System conducts its business, both academically and administratively, and the job-related actions of

7

the Commissioner of Higher Education, are public matters. Thus, the Policy Committee's meetings brought together public officials for an undeniably public purpose.

¶20 Crofts admits that the meetings in question are occasions where public officials gather for a public purpose. However, he argues that because the Policy Committee has no definite membership, no specific charter or goal to accomplish, is not created by a specific order of either the Board of Regents or Crofts, and neither votes on propositions nor takes any direct action, it is not a public body as contemplated by Article II, Section 9, of the Montana Constitution and the open meeting laws.

¶21 The determination of whether advisory committees are public bodies subject to the open meeting laws has been recognized as presenting special problems for courts. *Bradbury v. Shaw* (N. H. 1976), 360 A.2d 123, 125 (superceded by statute). Moreover, the legislation enacted by the different states on this issue is so varied that decisions from other jurisdictions are of little help in resolving the instant question. *Tribune Pub. Co. v. Curators of University of Missouri* (Mo. 1983), 661 S.W.2d 575, 583. Many factors have been considered in deciding if a particular committee's meetings were required to be open to the public. Additionally, each situation must be examined in the context of the applicable constitutional and statutory provisions. ANN TAYLOR SCHWING, OPEN MEETING LAWS 2D § 4.42, at 89, § 4.44, at 94 (2000).

¶22 Consideration of Montana's particular constitutional and statutory schemes leads us to the conclusion that Crofts' interpretation of what constitutes a public body is too narrow. We conclude that under Montana's constitution and statutes, which must be liberally

8

interpreted in favor of openness, factors to consider when determining if a particular committee's meetings are required to be open to the public include: (1) whether the committee's members are public employees acting in their official capacity; (2) whether the meetings are paid for with public funds; (3) the frequency of the meetings; (4) whether the committee deliberates rather than simply gathers facts and reports; (5) whether the deliberations concern matters of policy rather than merely ministerial or administrative functions; (6) whether the committee's members have executive authority and experience; and (7) the result of the meetings. This list of factors is not exhaustive, and each factor will not necessarily be present in every instance of a meeting that must be open to the public. A proper consideration of these factors does not mandate that every internal department meeting meet the requirements of the open meeting laws. Meetings where staff report the result of fact gathering efforts would not necessarily be public. Deliberation upon those facts that have been gathered and reported, and the process of reaching decisions would be open to public scrutiny. The guiding principles are those contained in the constitution; that is "no person shall be deprived of the right to examine documents or to observe the deliberations of all public bodies or agencies of state government and its subdivisions," and "all meetings of public or governmental bodies . . . supported in whole or in part by public funds . . . must be open to the public." Art. II, Sec. 9, Mont. Const.; § 2-3-203(1), MCA (2001).

¶23 The Policy Committee is not merely a fact finding body, nor is it an *ad hoc* group which came together to consider a specific matter or to gather facts concerning a particular issue. It is a committee that was created and continued by Crofts, and it is not unlike the

committee that the Director of the Department of Corrections appointed to advise him in *Day*, which was found to be a public body. *Day*, ¶¶ 5, 18. As was the case in *Day*, the Policy Committee was not appointed pursuant to a statute or regulation, but by the head of a department of the State of Montana to tender advice and make recommendations. See *Day*, ¶ 5.

¶24 The Policy Committee came together at times that were noticed, and agendas were prepared. Moreover, while the record does not contain minutes of the Policy Committee's meetings, the agendas make it clear that the matters deliberated were somehow memorialized, as such matters were remembered, and re-discussed at successive meetings. The Policy Committee's meetings required substantial time, inconvenience and travel by the attendees, all of whom were expected to attend. Further, the various costs of conducting the meetings were paid with public funds.

¶25 A review of the record reveals that the District Court was correct that the meetings of the Policy Committee were more than simply staff meetings. The meetings in question were held for much more than mere fact gathering and reporting. Crofts used these meetings to seek input, opinions, and guidance from the Committee regarding the policy decisions he was required to make as Montana's Commissioner of Higher Education.

¶26 As we noted above, the Policy Committee was made up of upper-level employees of Montana's University System. These upper-level employees did not convene for the purpose of delivering the results of factual investigations to Crofts. Rather, the agendas indicate that the Policy Committee deliberated, discussed, and debated a wide variety of issues. The

10

Committee then applied their considerable knowledge to the issues, and advised Crofts on how he should proceed. The District Court found that these meetings: "included tuition and fees, student financial planning, course fees, distance education fees, athletic funding, salaries, Indian education planning, diversity, writing proficiency, credit cap, students called to active duty, and reciprocal campus services." It then went on to conclude: "All of these matters are important to the public and in particular to prospective students and employees of the University System."

¶27 In addition, the record reveals that the Committee deliberated on legislative strategy; the extent to which the Board of Regents should be involved in campus planning; guidelines for determining what percentage of the cost of a college education should be covered by tuition; budget planning, including consideration of salary increases; tuition and fees; development of information technology policies; the fiscal and political implications of a retired school district administrator teaching at a unit of the University while drawing retirement pay; whether to use interest income arising out of non-resident tuition for scholarships for non-resident students; dental hygiene pre-admission course requirements and how to attract students to the program; the implementation of writing proficiency standards; the policy concerning continuous enrollment of transfer students; and policies concerning the transfer of class credits. The facts had been gathered when the members arrived at the meeting and once there they deliberated positions and solutions. The function performed by the committee, as revealed by the record, was to make decisions on how to proceed.

¶28 Clearly, the Policy Committee met to deliberate on matters of substance.

11

Accordingly, we hold that the Policy Committee is a public body within the meaning of Article II, Section 9, of the Montana Constitution and Montana's open meeting laws.

¶29    Crofts argues that even if the Policy Committee is deemed to be a public body, it does not hold "meetings," as contemplated in the open meeting laws, because the Committee's membership is not fixed, no number of members were required to attend to constitute a quorum, and neither direct action nor votes were taken at its meetings.

¶30    Section 2-3-202, MCA (2001), defines the term "meeting" as:

> [T]he convening of a quorum of the constituent membership of a public agency or association described in 2-3-203, whether corporal or by means of electronic equipment, to hear, discuss, or act upon a matter over which the agency has supervision, control, jurisdiction, or advisory power.

Nothing in the plain language of § 2-3-202, MCA (2001), requires that a meeting produce some particular result or action, or that a vote on something be taken. All that is required is that a quorum of the membership convene to conduct its public business.

¶31    In this case, the parties stipulated that each person who attended a meeting of the Policy Committee was invited because he or she was an employee of the University System that held a responsible position. It was also agreed that there were no established rules of procedure and no quorum requirements. Thus, a quorum of the Policy Committee consisted of the members who were in attendance at any particular meeting. The common law rule is that a quorum of any body of an indefinite number consists of those who assemble at any meeting thereof. *Application of Havender* (N.Y. 1943), 181 Misc. 989, 992. There being no statute, rule, or precedent to the contrary, this rule of common law applies in this instance to our interpretation of § 2-3-202, MCA (2001). Section 1-1-108, MCA (2001). Moreover,

12

our constitution mandates that the deliberations of public bodies be open, which is more than a simple requirement that only the final voting be done in public. Devices such as not fixing a specific membership of a body, not adopting formal rules, not keeping minutes in violation of § 2-3-212, MCA, and not requiring formal votes, must not be allowed to defeat the constitutional and statutory provisions which require that the public's business be openly conducted. Therefore, we hold that the meetings of the Policy Committee were meetings within the meaning of § 2-3-202, MCA (2001).

¶32 Article II, Section 9, of the Montana Constitution provides that no person shall be deprived of the right to observe the deliberations of public bodies. Government operates most effectively, most reliably, and is most accountable when it is subject to public scrutiny. *Day*, ¶ 34. The Policy Committee is a public body which deliberates on substantive issues that are the public's business. Accordingly, we hold that the meetings of the Policy Committee are subject to the requirements of Montana's open meeting laws and Article II, Section 9, of the Montana Constitution.

## ISSUE 2

¶33 Did the District Court correctly award the Respondents their attorneys' fees?

¶34 The District Court granted the Respondents' motion for summary judgment on January 3, 2003. On January 8, 2003, the Respondents filed a notice of entry of judgment, and on January 9, 2003, they filed a motion requesting that the District Court award them attorneys' fees. Crofts objected to the Respondents' motion for attorneys' fees. The District Court conducted a hearing on this matter on February 25, 2003. The District Court then

13

issued an order granting the Respondents their attorneys' fees and costs on April 3, 2003.

¶35 On appeal, Crofts contends that because the District Court failed to make a ruling on the Respondents' motion for attorneys' fees within 60 days, the motion was deemed denied. Therefore, Crofts alleges the District Court did not have jurisdiction to award the Respondents their attorneys' fees on April 3, 2003. We agree.

¶36 The District Court's order granting the Respondents' motion for summary judgment was a final determination of the rights of the parties to this action, and is the subject of the instant appeal. See Rule 54(a), M.R.Civ.P. The Respondents treated it as such when they filed their notice of entry of judgment on January 8, 2003. A motion for attorneys' fees filed after entry of a judgment is treated as a motion to alter or amend a judgment. *In re Marriage of McDonald* (1979), 183 Mont. 312, 314, 599 P.2d 356, 358. A motion to alter or amend a judgment must be ruled on within 60 days or it is deemed denied. Rule 59(g), M.R.Civ.P.

¶37 In this case, the Respondents filed their motion for attorneys' fees on January 9, 2003. Pursuant to Rule 59(g), M.R.Civ.P., the District Court then had until March 10, 2003, to render a decision regarding such motion. The District Court failed to do so. Rule 59, M.R.Civ.P., contains a mandatory jurisdictional time limitation, to which this Court strictly adheres. *Johnson v. Eagles Lodge Aerie* (1997), 284 Mont. 474, 480, 945 P.2d 62, 65. Thus, the motion was deemed denied on March 11, 2003, and the District Court had no jurisdiction to enter its April 3, 2003, order awarding the Respondents their attorneys' fees. Accordingly, the District Court's order of April 3, 2003, must be reversed.

¶38 For the foregoing reasons, the judgment of the District Court requiring the meetings of the Policy Committee to be open to the public is affirmed, and its award of attorneys' fees

14

to the Respondents is reversed.

/S/ JOHN WARNER

We Concur:


/S/ JAMES C. NELSON
/S/ PATRICIA O. COTTER
/S/ JIM REGNIER
/S/ JIM RICE

Justice W. William Leaphart dissenting.

¶39     I dissent.

¶40     I would apply the "functional analysis" that has been urged by amicus curiae State of Montana. Under that analysis, the Court should distinguish between "fact-finding" efforts of state agencies and the "deliberative" process whereby state agencies with governmental authority reach substantive decisions. Although the Court, in conclusory fashion, states that the Senior Management Group was doing more than "fact-finding"–that it was "deliberating"–the Court does not develop a workable definition of "deliberative." In my view, if the functional analysis is properly applied, we would conclude that the group is not a "deliberative" body as that term is used in the Montana Constitution, Article II, Section 9.

¶41     Commentators have divided the agency decision-making process into three stages: collective inquiry, deliberations, and decision. *R. Berg & S. Klitzman, An Interpretive Guide to the Government in the Sunshine Act* 9 (1978). Collective inquiry is triggered when an issue comes to the attention of the agency. Agency personnel and their staff gather information to define the issue, gather expertise and identify possible solutions without comparing them. *See, e.g., Arkansas Gazette Company v. Pickens* (Ark. 1975), 522 S.W.2d 350, 357 (Fogleman, J. concurring) ("[t]here is an appropriate investigative and exploratory stage preceding many actions by governmental bodies and agencies"). The so-called "fact-finding" stage includes seeking expert advice, creating study commissions, exploring issues or simply brainstorming. *Berg & Klitzman*, 9.

16

¶42    In contrast to the fact-finding stage, deliberation is "to think about deliberately and often with formal discussion before a final decision." Webster's Ninth Collegiate Dictionary (1991). The distinction between deliberative and fact-finding functions is best illustrated by contrasting our decisions in *SJL of Mont. Assoc. v. City of Billings* (1993), 263 Mont. 142, 867 P.2d 1084, and *Great Falls Tribune Co., Inc. v. Day*, 1998 MT 133, 289 Mont. 155, 959 P.2d 508. In *SJL*, the Billings Public Works Director, the Billings City Engineer and individuals representing a private contractor and a private engineering company met "to discuss the problems and concerns surrounding the delays in construction" on a street project in Billings. *SJL*, 263 Mont. at 144, 867 P.2d at 1085. Noting that Article II, Section 9, is designed to encompass government entities which are authorized "to make rules, determine contested cases or enter into contracts," *SJL,* 263 Mont. at 147, 867 P.2d at 1087, we concluded that the meeting between the Billings officials and the private engineering company was not subject to the open meeting law requirements.

¶43    This is in contrast to the decision in *Day*, where the Director of the Department of Corrections appointed a Private Prison Screening and Evaluation Committee and mandated that the Committee "deliberate" in order to make recommendations as to which specific contractor the Director should select. *Day*, ¶ 5. We concluded that the Committee was a public body and that the proposals which were submitted to it were public writings subject to public inspection. *Day,* ¶¶ 18-19. The State points out that the same public access requirements might not have held true for some sub-group of the Private Prison Screening and Evaluation Committee or staff assigned to gather information about private prison

facilities in other jurisdictions or to accumulate and analyze information about the financial histories of various bidders. Such activities, falling short of a recommendation or a decision, would properly be categorized as "collective inquiry" or fact-finding.

¶44 The decision of the Maryland Court in *Abell Publishing Co. v. Bd. of Regents* (Md. Ct. App.1986), 514 A.2d 25, is instructive in the context of the present dispute. Dr. John Slaughter, Chancellor of the University of Maryland at College Park, appointed a task force charged with looking into "Academic Achievement of Student-Athletics." The subcommittees of the task force refused to open their meetings to the public. Relying on the First Amendment and Article 40 of the Maryland Declaration of Rights, the *Baltimore Sun* sought a prohibitory injunction to prevent the subcommittees from holding closed meetings. The *Sun* contended that the task force was created by a rule, resolution or bylaw of the board of regents and that, since the board is a public body, the task force, as an arm of the board, was subject to the open-meeting requirements. In upholding the denial of the injunction, the court of appeals noted that Chancellor Slaughter had wide discretion in making policy decisions with respect to the campus and he was empowered to appoint task forces which report to him. The court found significant the fact that the task force was created by the chancellor, not the board of regents. The court held that meetings held by the subcommittees of the task force were not subject to the open meeting act.

¶45 In *Bennett v. Warden* (Fla. App. 1976), 333 So.2d 97, 100, the Court of Appeals of Florida held that the open meeting law did not apply to meetings between a college president and a group of junior college employees, called the Career Employees Council (CEC). The

18

CEC members were designated by the president as representatives of the career employees for the purpose of discussing with him various problems and suggestions relating to employees' working conditions in general and wages and hours in particular. The court held that the president of the college is merely an executive officer of the board of trustees and is no different than any other executive officer of any other board, agency or commission of government. He was thus neither a "board" nor a "commission" within the ambit of the Sunshine Law. The court concluded that "frequent and unpublicized meetings between an executive officer and advisors, consultants, staff or personnel under his direction, for the purpose of 'fact-finding' to assist him in the execution of those duties, are not meetings within the contemplation of the Sunshine Law." *Bennett,* 333 So.2d at 99. The court also observed that the president's recommendations resulting from meetings with the CEC were made to an administrative council whose meetings are open to the public and that the recommendations of the council are submitted to the board of trustees for decision. Having noted that context, the court concluded that CEC is far too remote in the decision-making process to be capable of making or formulating policy or crystalizing decisions.

¶46    Although the Court here pays lip service to a distinction between deliberative decision-making and fact-finding, its conclusion that the Senior Management Group is a "deliberative" body does not withstand scrutiny. The Senior Management Group was not created by law, rule or regulation and thus has no legally imposed charge or mandate to decide anything. It has no definite membership and does not vote on propositions or take any direct action. Rather it is a group of upper-level university employees formed at the behest

19

of the Commissioner of Higher Education with no specific charge to perform any function other than confer with the Commissioner. The Commissioner in turn makes recommendations to the Board of Regents, which, in open meetings, deliberates and makes final decisions. The management group is too far removed from the decision-making process to trigger the need for public access. Given that the Commissioner is free to disband the management group and dispense with any further meetings, it seems anomalous to hold that a group which has no collective authority, no constituent membership, and no legal obligation to meet in the first instance, must, if it does meet, give notice of its meeting, vote and maintain minutes pursuant to § 2-3-201et seq., MCA.

¶47    The Court purports to set guidelines as to when meetings are required to be open to the public. These guidelines, however, are so broad that they provide no real guidance. First of all, the seven guidelines are addressed to when, where, and why "committees" meet. Although the Court does not define "committee," it is apparent that anytime any two public employees meet during office hours and discuss public matters, they constitute a "committee" engaged in a "meeting." Thus an administrator of a state departmental division who voluntarily decides to hold periodic meetings of the division's employees for the purpose of formulating recommendations to the department director would be bound to comply with open meeting laws. Likewise, when the Governor decides to meet regularly with a department head to discuss, for example, proposed legislation, such meetings would clearly fall within the guidelines and require public access. As the State points out, interagency gatherings, or "meetings," occur literally hundreds of times each month across the State of

20

Montana. By way of example, the State cites to ad hoc meetings among employees of the Environmental Management Bureau of the Permitting and Compliance Division of the Department of Environmental Quality and employees of the Minerals Management Bureau of the Trust Land Management Division of the Department of Natural Resources and Conservation meeting to discuss ongoing agency responsibilities and specific projects such as the progress of the preparation of an environmental impact statement for a proposed mining operation on school trust land.

¶48 The Florida Court noted in concluding that meetings between an executive officer and employees or advisors under his direction are not subject to open meeting requirements:

> Any other conclusion, carried to its logical extension, would in our view unduly hamper the efficient operation of modern government the administration of which is more and more being placed in the hands of professional administrators. It would be unrealistic, indeed intolerable, to require of such professionals that every meeting, every contact, and every discussion with anyone from whom they would seek counsel or consultation to assist in acquiring the necessary information, data or intelligence needed to advise or guide the authority by whom they are employed, be a public meeting within the disciplines of the Sunshine Law. Neither the letter nor the spirit of the law require it.

*Bennett*, 333 So.2d at 99-100.

¶49 Article II, Section 9, provides that no person shall be deprived of the right to examine documents or to observe the deliberations of all public bodies or agencies of state government and its subdivisions. I interpret "deliberations" to mean the process by which a public body, legally charged with the duty or discretion to make a decision or recommendation, reaches a decision. I do not interpret "deliberative" "public body" as encompassing a management group with no enabling law, rule or order, with no defined

21

membership, with no charter or mandate, and which does not vote on propositions and has not taken any direct action such as adopting a formal policy.

¶50     Clearly, the Constitution guarantees the public access to the "deliberative" process whereby public agencies with governmental authority make decisions. *See Great Falls Tribune* (Director of the Department of Corrections delegated authority to Screening Committee) and *Common Cause v. Statutory Committee* (1994), 263 Mont. 324, 868 P.2d 604 (duties, size and membership of nominating Committee dictated by statute). The Court, however, needs to meaningfully define "deliberative" in such a manner that the open meeting requirements (quorums, minutes, voting and advance notice, §§ 2-3-202 and -212, MCA) are not counterproductively imposed on administrative or fact-finding meetings of public agencies. In deeming this ill-defined, amorphous Senior Management Group a "deliberative" decision-making body subject to open meeting requirements, the Court is creating more, not less, confusion.

¶51     I would reverse the decision of the District Court.


                                        /S/ W. WILLIAM LEAPHART

Chief Justice Karla M. Gray joins in the dissent of Justice Leaphart.



                                        /S/ KARLA M. GRAY




22